## Taylor, Appellant *v.* Mountz.

Argued November 13, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*A. Samuel Buchman,* for appellant.

*Norman R. Bradley,* with him *Ralph S. Croskey,* and *Croskey & Edwards,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, December 29, 1956:

On January 17, 1953, in the City of Philadelphia, a car operated by the plaintiff Henry Taylor southwardly on 15th Street, and one operated by the defendant Charles W. Mountz eastwardly on Berks Street, collided at the point where these two streets intersect, and as a result Taylor sustained serious damages, to recover which he brought suit against Mountz. At the ensuing trial the jury disagreed, and the defendant, under the Act of 1911, P.L. 70, 12 P.S. 684, moved for judgment on the whole record. The motion was granted by the lower Court, and this appeal followed.

Fifteenth Street, which is a through thoroughfare, is protected against traffic coming out of Berks Street by a *Stop* sign erected on the latter street. On the day of the accident, which is the subject of this lawsuit, the defendant drove by the Stop sign and it is practically unquestioned that this defection on his part became the proximate cause of the mishap which followed. It is the contention of the defendant, however, that regardless of his negligence the plaintiff is barred from a recovery because of contributory negligence. He argues that the plaintiff should have known that he would ignore the Stop sign and that, therefore, his (the plaintiff's) injuries are the result of his own heedlessness.

The plaintiff testified that as he approached Berks Street, travelling at 25 miles per hour, he saw Mountz's car some 150 to 200 feet away, that he (the plaintiff) then slackened his speed and when he reached a point 50 feet from the intersection he was moving at 15 miles per hour. He related that when he first caught sight of the Mountz car it was moving at 20-25 miles per hour, but that when it arrived at a point 20-25 feet from the intersection it slowed down to such an extent that to the plaintiff it "seemed like he (Mountz) was about to come to a stop."

During one phase of his testimony the plaintiff said: "Q. How fast was the defendant's car going? A. It seemed to me he had broken his speed. Q. Did you estimate whether or not he was going 10 miles an hour? A. Probably 20 to 25 miles an hour."

Standing on the platform of this last answer the defendant contends, and the lower Court has agreed with him, that if he (the defendant) approached the intersection at 20-25 miles per hour, it must have been quite apparent to the plaintiff that the defendant did not intend to respect the Stop sign and it was accordingly the plaintiff's duty, under the circumstances, to come to a stop himself and thus avoid a collision. But this argument seeks to impale the plaintiff on one answer alone. But the plaintiff made many answers and we must consider them all. In a review of this kind, the record is to be read in the light most advantageous to the plaintiff. That light should illuminate the favorable inferences while shadows fall on the unfavorable inferences. If the general highway of the evidence leads to the conclusion that the plaintiff was justified in doing what he did, he may not be denied a jury trial because one contrary fact-pebble disputes that conclusion.

In addition to what has already been quoted, the plaintiff testified: "Q. About how far back from 15th Street, from the west curb, was Mr. Mountz' car when you say it started to break down its speed? A. 20 to 25 feet back. Q. Up until that point would you say he continued at the same speed? A. As I approached, it *seems as though he slowed down.* Q. Before he seemed to slow down, did he maintain the same rate of speed? A. No, sir. Q. Can you give us an answer to that? Did he go faster? A. No, sir. Q. Did he maintain the same rate of speed until he started to brake his

car? A. He might have *slowed down a little.* Q. When you first saw Mr. Mountz' car 25 feet away going 25 miles an hour, you continued to watch him? A. Yes." (Emphasis supplied)

Taylor also testified that he arrived at the intersection first: "Q. When your front bumper was at the house line, where was the defendant's car? A. He had not quite gotten to the intersection. Q. Could you approximate it in feet? A. About 15-10 feet."

The fact that the plaintiff arrived at the intersection first, plus the fact that 15th Street is 26 feet wide, plus the fact that he was travelling in the east lane (the farthest away from Mountz), made it not unreasonable for him to conclude that Mountz would still stop before reaching his lane of travel. A motorist has the right to assume that other motorists will obey the law. In *Martin v. Gall,* 370 Pa. 258, we said: "While every motorist is bound to exercise reasonable care even though he has the right of way, he has the right to suppose that anyone coming to an intersection marked with a stop signal will obey the legal admonition and yield to the vehicle entitled to the priority of crossing. Through highways would lose their whole significance if motorists on those highways were required themselves to stop to ask the pleasure of cars in transversal traffic. All vehicles moving into through highways are statutorily called upon to cease movement not only to allow through traffic to pass but to cease movement absolutely, even though no one else be on either of the intersecting highways."

Defendant's counsel maintains in his brief, and there is law to that effect, that an automobilist may not drive blindly into an intersection even though he be on a through street and even though he have a green light,

but there is no evidence in this case that the plaintiff blindfolded himself as he approached and started across Berks Street. He testified that he looked up Berks Street as he proceeded toward the crossing and observed the defendant 200 feet away; when he had traversed 100 feet he looked again; and as he entered the intersection he looked once more. He could scarcely have looked any more without ignoring completely what was directly ahead of him. A driver at the wheel has other things to do besides training his gaze on potential adversaries driving by Stop signs. He has his own car to guide and control, he must keep an eye on pedestrians that might cross his path, he must be careful of traffic that could come from the other side.

It is because of these multifarious obligations pressing upon a motorist on a through highway that Stop signs are erected to protect him. And he should not be penalized for assuming that other motorists driving directly toward such a Stop sign will violate the laws of the road, of general safety, and even of self-preservation by tilting a lance of recklessness against it.

Every person on the highway, while required to employ his senses at all times in detecting and avoiding danger, is under no compulsion to assume that his fellow-travelers are bereft of their senses or that they will assault him with a weapon or an automobile fender. He has the right to assume that since stop signs are beacons of safety other drivers will no more turn a blind eye to them than a ship's master at the helm would ignore a lighthouse on a stormy night and a calamitous sea.

In the case of *McCormick Transp. Co. v. Philadelphia Transp. Co.,* 161 Pa. Superior Ct. 533, the late and lamented Judge Ross well stated the applicable law when he said: ". . . A driver having the right of way

may assume within reasonable limits that one approaching on an intersecting road or street will obey the law and give him the right of way . . . and he would not be chargeable with contributory negligence merely because he failed to anticipate the negligence of the other driver."

In the case of *Newman v. Protective Motor Service Co.*, 298 Pa. 509, where a truck driver disregarded a traffic signal, injuring the plaintiff-pedestrians, the defendant contended that the pedestrians should have kept looking as they crossed the street. We held that "They were not bound to anticipate that the defendant's driver would disregard the traffic signal . . . Indeed they had the right to assume that the driver of defendant's truck would be regardful of his duties to others on the highway."

In the case of *Campbell v. Balis*, 380 Pa. 245, 248, we said: "Judge ALESSANDRONI, the learned judge in the court below, cogently expressed the law on this point when he said: 'When a pedestrian commits himself to a crossing, having used due care up to that point, a negligent actor cannot complain because the pedestrian assumed that the actor would obey the law and not carelessly run him down. Such a pedestrian need not continuously swivel his head from side to side in order to be free of contributory negligence.' "

In like circumstances a law-abiding motorist is no more required to swivel his head like a ventriloquist's dummy than a pedestrian.

Although it is proper, and indeed necessary, in reviewing a case to reconstruct the happening which becomes the subject of the litigated controversy, the review should not isolate a fragmentary second and set it apart for study entirely separated from the fleeting stream of events which precedes and follows it. As

Taylor neared the intersection he saw Mountz advancing toward the Stop sign not at breakneck speed but at a very moderate rate of propulsion; he then saw him slowing down and apparently coming to a stop. It was not until Mountz got beyond the Stop sign that Taylor could be sure Mountz would not stop. Under those circumstances it is not in keeping with the natural course of events to say that in that split second when it was possible Mountz might not stop, Taylor then had to himself stop to ascertain what Mountz would do,—it being more probable than not at that moment that Mountz would stop. One usually reads the record of a trial as if he were watching a motion picture film of the action described, and he can stop the film at any given point for as long as he desires and calculate, in cool and unruffled deliberation, what would be best for the actor to do at that particular crisis. However, when the action actually occurred, the actor did not have that pause for reflection. He had to decide at that very instant what to do, and if he did what any reasonable person would have done at that moment he cannot legally be charged with contributory negligence even though, in the revelation of what followed, he erred in his lightning-made decision.

But there is even a stronger reason why judgment should not have been entered in favor of the defendant in this case. The Act of 1911 provides that in considering the matter of judgment the decision shall be based on the "whole record." The whole record naturally includes the testimony adduced by the defendant as well as that presented by the plaintiff. In deciding whether the motion on the whole record should be granted, the inquiry is not as to what one particular person or persons said, but as to the effect produced by all the witnesses. Important as may be the testimony of each in-

dividual witness, that testimony is only one piece in the entire mosaic, from the whole of which the picture is derived as to culpability or non-culpability of the central figures.

Although the plaintiff, in answer to one question, did say that the defendant approached the intersection at 20-25 miles per hour, we will recall that he also said that the defendant diminished that speed. And it is highly relevant and vital to note that the defendant himself declared that he was moving slowly as he rolled toward the stop sign: "Q. What did you see when you looked north on the street, as you testified you could see 60 feet? A. The front bumper of my car was approximately 10 feet from the curb line and *I was travelling 3 to 6 miles an hour* into the intersection, and I looked north and I could see 60 feet, and I did not see anything. Q. Then what happened? A. Well, I practically came to a stop. I did not stop, but *I practically came to a stop,* and my fiancee screamed that there was a car coming. I applied the brake, but it was too late. . . . Q. At what speed did you slow down before you entered the intersection? A. *To a creep or crawl, about three or four miles an hour."* (Emphasis supplied.)

Certainly anyone watching a motorist creeping toward a Stop sign at 3 miles per hour could come to only one conclusion, and that is that the creeping motorist would stop at the barrier which presumably induced his snail's pace.

In a trespass action where negligence has been fastened on the defendant but the defendant charges the plaintiff with contributory negligence, his is the burden of proving that contributory negligence. The record here fails to show any such proof. In the case of *Cericola v. Redmon,* 182 Pa. Superior Ct. 19, where the

plaintiff was struck by the defendant who went through a Stop sign, the Court held that the question of contributory negligence was one for the jury. In a very able Opinion Judge WOODSIDE summed up the law which could well apply to this case: "The driver on a through highway has the right to assume that persons approaching on intersecting streets will obey a stop sign and yield the right of way as required by the Vehicle Code . . . Cericola had the right to assume that Redmon would not violate the law by driving into the intersection when Cericola had the right of way. Acting upon this assumption was not negligent . . . 'The assumption that another driver will obey the traffic rules cannot be adjudged negligent unless the person making the assumption has timely warning that his confidence in the other's lawabidingness is misplaced.' . . . Traffic lights and 'Stop' signs are installed to facilitate the flow of traffic. When one has the right of way by virtue of being on a through street or having a green light he must not be held to the exact degree of care that would have been required of him had there been no light or stop sign in his favor at the intersection. To hold otherwise would thwart the purpose of through highways and traffic lights to facilitate the flow of traffic."

Judgment reversed with a v.f.d.n.