**Jane KLEIN and Douglas Klein, her husband**

v.

**John S. HOLLINGS; Ryder Truck Rental, Inc.; Tennessee Kartage, Inc.; Ryder Temperature Control Carrier, Inc.**

**John S. Hollings; Ryder Truck Rental, Inc. and Tennessee Kartage, Inc. a/k/a Ryder Temperature Control Carriage, Appellants.**

**Jane KLEIN and Douglas Klein, her husband**

v.

**John S. HOLLINGS; Ryder Temperature Control Carrier, Inc.**

**John S. Hollings; Ryder Truck Rental, Inc. and Tennessee Kartage, Inc. a/k/a Ryder Temperature Control Carriage, Appellants.**

Nos. 92–1646, 92–1647.

United States Court of Appeals, Third Circuit.

Argued Feb. 23, 1993.

Decided May 11, 1993.

Edward L. McCandless (argued), McCandless & Associates, Philadelphia, PA, for appellants.

Peter J. Neeson (argued), Daniel J. Ryan, and John R. Brown, LaBrum & Doak, Philadelphia, PA, for appellees.

PRESENT: HUTCHINSON, NYGAARD and SEITZ, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellants, John S. Hollings, Ryder Truck Rental, Inc., Tennessee Kartage, Inc. and Ryder Temperature Control Carriage, Inc. (collectively "the Defendants"), appeal a November 26, 1990 order of the United States District Court for the Eastern District of Pennsylvania. That order granted Appellees, Jane Klein and her husband Douglas Klein ("the Kleins"), a new trial after a jury returned a verdict in favor of all the Defendants in an action arising from an October 18, 1988 automobile accident. The Defendants also appeal the judgment entered against them as a result of the second trial in which a second jury found them 90% negligent, and the district court's denial of their motion for judgment n.o.v. or for another new trial. In this respect, the Defendants argue that the district court abused its discretion in granting the Kleins a second trial. They contend that the district court committed a number of errors during the second trial which mandate vacating the judgment and remanding for a third trial.

We hold that the district court did abuse the somewhat limited discretion it has to grant a new trial because a jury's verdict is against the weight of the evidence. Accordingly, we will vacate the November 26, 1990 order of the district court granting the Kleins a new trial, vacate the judgment entered on October 16, 1991 in the second trial and order the district court to reinstate the verdict reached by the first jury.

The district court had jurisdiction over this action pursuant to 28 U.S.C.A. § 1332 (West Supp.1992). We have jurisdiction over this appeal from the final judgment and order of the district court pursuant to 28 U.S.C.A. § 1291 (West Supp.1992).

## I.

This action arises out of an automobile accident on the night of October 18, 1988. At about 11:30 p.m., appellee John Hollings ("Hollings") was driving his tractor-trailer rig west on Route 73 in the Schwenksville–Skippack area in Pennsylvania. Route 73 is a two lane road that runs east-west through Skippack. Unfamiliar with the area, Hollings decided to bed down for the night along the side of the road. He also decided to turn the truck around to park beside Route 73 facing east. To make the turn, Hollings turned left onto Cressman Road, a north-south road which intersects Route 73, and backed up across Route 73 until his vehicle sat at a stop sign on Cressman Road, north of Route 73.

Hollings testified at the first trial that he looked both ways, allowed a few cars to pass, then observed no traffic and proceeded slowly into the intersection with the intention of making a left turn into the eastbound lane of Route 73. A local resident, Marilyn Gallagher, observing from her front porch, testified that before going inside her home she watched the truck complete approximately three-quarters of its turn across the westbound lane. She saw no oncoming traffic. Testimony at trial established that it would take approximately nine to ten seconds before the rear of Hollings's vehicle would clear the intersection. The speed limit on this section of Route 73 is 45 miles per hour.

About 400–500 feet east of the intersection of Route 73 and Cressman, Route 73 crests a hill and then runs down to the intersection. As the truck was executing its turn, Jane Klein, travelling westbound on Route 73 in her 1980 Toyota station wagon, drove over the hill. The parties dispute Mrs. Klein's speed. She testified that she saw "really bright lights" in the eastbound lane after coming over the hill but was at first unconcerned because they were not in her lane. Appellants' Appendix (App.) at 24a. She did notice that the headlights "didn't appear to be moving right, moving very slowly." *Id.* Then, Mrs. Klein realized that part of a truck was in her lane. At once, she says, she applied her brakes. They left 68 feet of skid marks but did not avoid the collision. Mrs. Klein's car struck the left rear tandem wheel of the trailer while it was still partly in the westbound lane. Despite being restrained by a seatbelt, Mrs. Klein fractured her left humerus and right ankle and also suffered lacerations of the face.

Hollings testified that he never saw Mrs. Klein's car until just before impact. He tes-

tified that he had generally been looking around in all directions but just before impact he was watching the rear of the truck to make sure it did not hit anything on the side of the road.

Shortly after the accident, Pennsylvania State Trooper Anthony Gant arrived on the scene. After interviewing witnesses and observing the situation, Gant issued Hollings a citation for violation of 75 Pa.Cons.Stat.Ann. § 3323(b) (1977), failure to yield the right of way at a stop sign. Hollings, a Florida resident who returned there following the accident, did not come back to Pennsylvania to contest the citation and a state court found him guilty *in absentia.*

The Kleins filed this diversity action in the United States District Court for the Eastern District of Pennsylvania. Their theory of recovery was Hollings's negligence. Trial commenced on February 12, 1990. At this first trial both sides called accident reconstruction experts. The Kleins called Dr. Ian Jones who gave an opinion about the speed of Mrs. Klein's vehicle based on the damage it sustained, technically called the "crush" of the vehicle. Dr. Jones opined that the vehicle was travelling approximately 15 miles per hour at impact and, given the length of the skid marks, that the pre-braking speed was approximately 41 miles per hour. Dr. Jones also testified to his personal observations at the crash site. He testified that sitting in his car at the intersection and looking east, he could see the headlights of an oncoming car from approximately 500 feet. Upon questioning from the court, Dr. Jones indicated that he had observed the actual beams of the headlights of the approaching car and not just their glow. He further opined that the top of the hill was approximately 400 to 450 feet from the intersection. Dr. Jones estimated that Mrs. Klein could see the trailer approximately 140 feet before the point of impact.

The Kleins also called Dr. Herschel Leibowitz who testified about the nighttime visibility from Mrs. Klein's perspective. Dr. Leibowitz stated that people need between 1.2 and 2.5 seconds to respond to hazards under the conditions present on the night of the accident. He also testified that he believed Mrs. Klein first saw the trailer portion of Hollings's tractor-trailer rig approximately 100 feet from impact and that the accident was caused by her inability to see the trailer any sooner.

The Defendants called Dr. Serge Borichevsky who testified that Hollings's turn took approximately 10 seconds to complete. He further testified that the crush of the vehicle indicated that Mrs. Klein was travelling about 30–35 miles per hour at impact and 48–50 miles per hour just before the accident. Borichevsky concluded that Mrs. Klein was approximately 739 to 782 feet from the intersection when Hollings began his turn and opined that her inattentiveness caused the accident. He also concluded that at this distance, Hollings would not have seen her car when he began his turn.

The Defendants also called Dr. Lawrence Thibault, a biomedical engineer and Associate Professor at the University of Pennsylvania Medical School. Dr. Thibault testified that the crush of the vehicle indicated an impact speed of 30–35 miles per hour. Dr. Thibault also examined Mrs. Klein's medical records and attempted to corroborate the impact speed from the severity of her injuries using the Abbreviated Injury Scale ("A.I.S."). The A.I.S., a study published by the American Association of Automotive Medicine, is based on reconstructions of numerous accidents with variables, *inter alia,* for the type of individual, the type of crash and the type of restraint device in use. The A.I.S. then correlates speed with injury. Using this method of computation, Thibault again calculated that the speed at the moment of impact was 30–35 miles per hour.

The district court refused to permit Trooper Gant to testify about the citation he issued to Hollings. The court held, because Gant was not present at the time of the accident, that the citation was not sufficiently probative of the actual occurrence to outweigh the prejudice involved in admitting a violation of state law. The court also relied on the fact that Hollings did not return to challenge the citation in granting the Defendants' motion *in limine.*

On February 15, 1990 the jury returned a verdict in favor of all defendants. In answer

to special interrogatories, the jury found that Hollings was not negligent but that Mrs. Klein was. The Kleins made a timely motion for a new trial on February 22, 1990 but did not file an accompanying brief or order as required by Local Rule 20. The Kleins also failed to order a transcript of the first trial as the local rule also requires. The Defendants filed a motion to dismiss based on both procedural irregularities and substantive grounds. On March 16, 1990 the Kleins ordered a transcript of the first trial. On March 20, 1990 the Kleins filed a response to the Defendants' motion to dismiss alleging substantial compliance with the rules. On May 17, 1990 the district court dismissed the Kleins' motion for a new trial for lack of prosecution. It noted that the transcript had been ready for over a month and the Kleins had failed to pursue their motion. On May 22, 1990 the Kleins filed a motion to vacate the district court's May 17, 1990 order under Federal Rule of Civil Procedure 60(b). At that time, they also filed a memorandum in support of their motion for a new trial.

On November 26, 1990 the district court reversed itself, vacated the May 17, 1990 order and granted the Kleins a new trial. It held that the jury's finding that Hollings was not negligent was against the weight of the evidence. The district court based its decision on two factors. It first relied on evidence tending to show that Hollings was not looking at the lane in which Mrs. Klein was travelling at the time of the accident. This, the court concluded, indicated negligence under Pennsylvania law. It also relied on its own observation that, based on the trial evidence of what transpired while Hollings sat at the intersection, "[i]f he had looked, he ought plainly to have seen at least the glow of the approaching headlights of plaintiff's vehicle, if not the vehicle itself." App. at 91a–92a.

The new trial commenced on October 7, 1991. It differed from the initial trial in a number of significant ways. First, the district court permitted State Trooper Gant to testify that he issued Hollings a citation for failure to yield the right of way. The court concluded that the Defendants opened the door for such testimony when they elicited testimony from Trooper Gant on cross-exam-

ination that the lighting of the trailer rig conformed to state laws. Second, the district court barred some of the expert testimony of Defendants' witness Dr. Thibault. Thibault again sought to testify as to the speed of the impact based upon the A.I.S. scale. The district court now decided to exclude the testimony as speculative and without sufficient scientific basis to be admissible under the Federal Rules of Evidence relating to expert testimony. Third, the district court permitted Dr. Jones to testify over objection to an observational experiment he conducted between the trials in which he attempted to ascertain the point at which Hollings would have seen the glow of the headlights from Mrs. Klein's car. Finally, the district court instructed the jury that it was the truck driver's duty to maintain a vigil of the lane in which Mrs. Klein was travelling at all times.

The second jury found Mrs. Klein only 10% negligent and awarded her damages in the amount of $324,000. The Kleins filed a motion to mold the verdict to add delay damages and the Defendants filed a motion for judgment n.o.v. or a new trial on October 25, 1991. By a memorandum opinion and order dated July 6, 1992, the district court denied the Defendants' motion and molded the second jury award so that the judgment was $359,564.47 with interest from October 11, 1991. The Defendants appeal this judgment on the basis of prejudicial error in the conduct of the second jury trial and that the second verdict was against the weight of the evidence. They also appeal the district court's November 26, 1990 order setting aside the first jury verdict and granting a new trial.

## II.

It is generally said that we review the grant of a new trial for an abuse of discretion. *Rotondo v. Keene Corp.,* 956 F.2d 436, 438 (3d Cir.1992). Our degree of scrutiny, however, differs depending on the reasons for granting the new trial. To the extent that a new trial is granted purely on a question of law, we exercise plenary review. *Id.; Waldorf v. Shuta,* 896 F.2d 723, 737 (3d Cir.1990). Conversely, the district court's latitude on a new trial motion is broad when

the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court, *e.g.* evidentiary rulings, *see Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991) or prejudicial statements made by counsel. *See Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). Where, however, the district court grants the motion because it believes the jury's decision is against the weight of the evidence "closer scrutiny is required by us on review. This is especially true when, as here, 'the litigation deals with material which is familiar and simple, ... lying well within the comprehension of [the] jurors....'" *Hourston v. Harvlan, Inc.*, 457 F.2d 1105, 1107 (3d Cir.1972) (quoting *Lind*, 278 F.2d at 91).

Along the continuum of discretion given the district court over these matters, we note that this case lies in the area where the district court receives the least deference because it concerns a matter—whether Hollings saw or should have seen the glow of the headlights—easily understood by a jury, *see Lind*, 278 F.2d at 91, along with matters of Pennsylvania law on which the district court's interpretation receives no deference. *See Waldorf*, 896 F.2d at 737.

We identified the competing concerns in *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344 (3d Cir.1991) where we stated:

> When the district court grants a motion for a new trial based on the weight of the evidence, the court has:
>
> > to some extent at least, substituted [its] judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial.

*Lind*, 278 F.2d at 90. Accordingly, the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. *EEOC v. Delaware Dep't of Health and Social Servs.*, 865 F.2d 1408, 1413 (3d Cir.1989) (quoting *Shanno v. Magee Indus. Enters., Inc.*, 856 F.2d 562, 567 (3d Cir.1988)). Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations such as passing "upon the nature of an alleged newly discovered organic compound in an infringement action." *Lind*, 278 F.2d at 90–91.

. . . .

Despite the limited nature of the district court's discretion in granting a new trial because a jury's verdict is against the weight of the evidence, we recognize that considerable deference remains due to that court's determination that a verdict is against the weight of the evidence. The trial judge observes "the witnesses and follow[s] the trial in a way that we cannot replicate by reviewing a cold record." *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir.1988). Nevertheless, new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience. *See Delaware Dep't of Health*, 865 F.2d at 1413.

*Williamson*, 926 F.2d at 1352, 1353. We decided that our task was to "examine the record to see if the district court could have reasonably concluded that a miscarriage of justice would occur if the jury's verdict were left stand." *Id.* at 1348 (citing *Shanno*, 856 F.2d at 567). We apply the *Williamson* standard here.

### III.

In granting the new trial after the jury returned a verdict for the Defendants, the district court stated:

The defendant Hollings testified that, before pulling out from the stop sign on Cressman Road, he looked both ways and did not observe any approaching traffic. Immediately before the impact, he was looking back over his left shoulder to make sure that the wheels of the trailer would clear the intersection. Except for a flash of light immediately before the impact, he never saw plaintiff's vehicle at all.

On the basis of the testimony of defendant Hollings himself, it seems clear that he failed to maintain a proper lookout, and that, in violation of the Pennsylvania Motor Vehicle Code, he failed to yield the right of way. Under that statute, it was his obligation not to proceed onto the through highway without ascertaining that it was reasonably safe for him to do so. If he had looked, he ought plainly to have seen at least the glow of the approaching headlights of plaintiff's vehicle, if not the vehicle itself.

Plaintiff's expert assumed it would take the tractor-trailer some nine seconds to complete the turn onto route 73. Defense experts placed the time limit as between 9.6 and 10.1 seconds. There was straight-line visibility of approximately 500 feet. When the defendant began his left-turn maneuver, plaintiff's vehicle at least must have been approaching the brow of the hill, and the approaching headlight glow should have been apparent. Moreover, defendant Hollings' failure to notice plaintiff's vehicle at any time before the accident shows conclusively his inattentiveness.

I conclude, therefore, that the jury's finding of no negligence on the part of the defendant driver is contrary to the overwhelming weight of the evidence, and must be set aside.

App. at 91a–92a. The district court's reasons for deciding to grant the new trial can be fairly said to depend on two factors: (1) its belief that Hollings should have at least seen the glow of the headlights and had he seen the glow, his negligence would have been established; and (2) its belief that Hollings's testimony that he did not see Mrs. Klein's car until shortly before impact conclusively demonstrated he was inattentive.[1]

### A.

We begin with the district court's determination that Hollings "ought plainly to have seen at least the glow of the approaching headlights ... if not the vehicle itself." *Id.* Implicit in that statement is the district court's belief that had Hollings seen Mrs. Klein's headlight or its glow, he would have been negligent in proceeding into the intersection. Pennsylvania law sets forth no such strict rule.[2]

Section 3323 of the Pennsylvania Vehicle Code provides in relevant part:

**(b) Duties at stop signs.—** ... After having stopped, the driver shall yield the right-of-way to any pedestrian in a crosswalk or to any vehicle in the intersection or approaching on another roadway so closely as to constitute a hazard during the time when the driver is moving across or within the intersection or junction of roadways.

75 Pa.Cons.Stat.Ann. § 3323(b). This statute imposes a duty to check the roadway before

---

1. In its July 6, 1992 order denying Defendants' motion for a new trial after the second jury decided against them, the district court said, for the first time, that an additional reason for granting the Kleins' motion for a new trial was "the jury may well have been led astray by some purported 'expert' testimony presented by the defendant." App. at 137. The expert testimony referred to was that of the Defendants' expert Dr. Thibault who had partly based his opinion on speed at impact on the Abbreviated Injury Scale ("A.I.S."). In any event, the record indicates that the Defendants called another expert at the first trial who testified about impact speed without reference to the A.I.S. The Kleins had an opportunity to question the use of the A.I.S. study on cross-examination and the district court

itself questioned the witness about the basis of his opinion and the possible shortcomings in A.I.S.'s methodology. Under the circumstances, we are not persuaded that the admission of this witness's testimony justified a new trial.

2. The duty of care owed in this negligence action is at least that established by the Pennsylvania Vehicle Code. *See Van Tine v. Cornelius*, 355 Pa. 584, 50 A.2d 299, 301 (1947); *Dougherty v. Merchants' Baking Co.*, 313 Pa. 557, 169 A. 753, 754 (1934); *Smith v. Brooks*, 394 Pa.Super. 327, 575 A.2d 926, 933 (1990), *alloc. denied*, 527 Pa. 625, 592 A.2d 45 (1991); *Noyes v. Sternfeld*, 164 Pa.Super. 461, 65 A.2d 433, 435–36 (1949).

proceeding. Under section 3323 a driver must maintain a distance in excess of that which would "constitute a hazard." *Accord Van Tine v. Cornelius,* 355 Pa. 584, 50 A.2d 299, 301 (1947) (vehicle may cross road only where, in exercise of reasonable care, driver believes crossing may be made without danger of collision). Many Pennsylvania cases reenforce the view that it is not illegal for a car to proceed into the road in the face of oncoming traffic if the driver reasonably believes that his maneuver can be completed without collision.[3] *See Pokusa v. Taylor,* 409 Pa. 41, 185 A.2d 331, 332 (1962); *Dougherty v. Merchants' Baking Co.,* 313 Pa. 557, 169 A. 753, 754 (1934); *Noyes v. Sternfeld,* 164 Pa.Super. 461, 65 A.2d 433, 435 (1949).[4] Accordingly, even had Hollings seen the glow of the headlights, he may still have been justified in proceeding forward so long as a reasonable person would have thought, after exercising due care at the outset, that his turn could be completed without collision.

What Hollings did see is clearly relevant in determining whether he could have reasonably thought it was safe to proceed. We, therefore, must review the evidence that was presented at trial concerning Mrs. Klein's approach to the intersection. It contains five references to whether Hollings saw the headlights of Mrs. Klein's car, four that support the jury's verdict and one that arguably could support the district court's conclusion.

On direct examination, Hollings testified that as he sat at the intersection of Cressman Road and Route 73 just before executing his turn, he looked to the east, the direction from which Mrs. Klein was approaching, and saw no cars or headlights. He then began his turn. Marilyn Gallagher, an eyewitness who lived at the intersection of Cressman Road and Route 73, testified that she observed Hollings complete approximately three-quarters of his turn before she turned away. She testified that before turning away, she looked both ways on the road and "there [was] nothing coming." App. at 9a. The Defendants' expert, Dr. Borichevsky, opined that

given Mrs. Klein's rate of approach, it was likely that Hollings did not see Mrs. Klein's car before he entered the intersection. Mrs. Klein testified that when she came over the crest of the hill, the cab of the truck was already in the eastbound lane. This admission supports an inference that Hollings's turn was already well underway at the time the car came over the hill and that he had started it before the time Mrs. Klein's headlights were visible.

The district court may have relied on the testimony of the Klein's expert, Dr. Jones, who testified on cross-examination to the distance at which headlights should have been seen in the following exchange:

> JONES: As I say, I measured the distance which you would see headlights coming towards you at approximately 500 feet.
>
> Q: You didn't measure to the crest of the hill?
>
> COURT: Would that in your view—before you got to the top of the hill or after you got to the top of the hill?
>
> JONES: It would be before it got to the top of the hill. Your eye height is usually about 44 inches above the ground.
>
> COURT: You would estimate the top of the hill is what, about 400 feet from the accident, more than that, less than that?
>
> JONES: 400, 450 feet. The important thing though is I did it at night because what you are seeing in the headlights the crest of the hill in daylight I don't think is particularly relevant.
>
> Q: I just want to know what the distance was. You estimate now to be about 400 feet.
>
> COURT: 400 to 450, he says.
>
> JONES: The measurement I actually took was the distance I was sitting in my car when I saw headlights at the intersection. And that distance I measured approximately 500 feet.

---

3. Thus, to the extent that the Kleins sought recovery based on the theory that Hollings was negligent solely because the accident took place in Mrs. Klein's lane, their theory is not supported by Pennsylvania law.

4. We note that these cases were decided under earlier provisions of the Vehicle Code; however, there is no material difference between these provisions and current law.

COURT: When you say you saw headlights, you saw the actual head lamp rather than just a glow of?

JONES: Yes.

. . . .

Q: Did you reach any opinion as to whether the glow on the oncoming headlights from the plaintiff's vehicle would have been visible to the driver of the truck before pulling out?

JONES: I stood at the intersection and timed when I could see lights of oncoming vehicles coming up over the brow of hill and that time was about nine seconds.

Appellees' Supplemental Appendix (Supp. App.) at 25A–26A–1, 29A. It is unclear from the last exchange whether Dr. Jones meant that cars could be seen from approximately nine seconds away at night or that the glow of the headlights could be seen for nine seconds before they crested the hill. We, like the district court, will assume the latter. In any event, the district court apparently agreed with Dr. Jones, disbelieved the direct testimony of Mrs. Gallagher and Hollings and concluded Hollings should have seen Mrs. Klein coming before he started to turn.

As discussed *supra,* Hollings had a duty to observe the westbound lane, ascertain whether he could proceed safely in an exercise of reasonable care and then proceed. The jury had before it evidence from which it could reasonably infer that Hollings looked and saw nothing that would give him reason to believe he could not make his turn without endangering other motorists. The jury was entitled to believe the Defendants' experts. Their estimates placed Mrs. Klein 739 to 782 feet from the point of impact and at least 250

feet on the other side of the hill when Hollings last checked her lane.[5] In short, given the evidence presented at trial, the jury could have reasonably inferred that Hollings saw nothing before he proceeded into the intersection.

### B.

The district court also relied on Hollings's failure to keep a vigil in the westbound lane in which Mrs. Klein was travelling while he was making his turn to bolster its conclusion that the jury's verdict was against the weight of the evidence. The district court cited Hollings's testimony that he never saw Mrs. Klein's car until the last moment and that he was looking towards the back of his truck at the time of the accident. The district court determined that even though Hollings might have been justified in beginning his turn, he negligently failed to continue to look into the westbound lane.

Pennsylvania law is not entirely clear on the duty that exists once one proceeds into an intersection. The Pennsylvania Supreme Court, in *Billow v. Farmers Trust Co.,* 438 Pa. 514, 266 A.2d 92, 93 (1970), imposed a separate, seemingly incompatible, duty to the one identified by the district court. In *Billow,* the supreme court upheld a non-suit based upon contributory negligence when a vehicle proceeded from a southern stop sign into a westbound lane after only looking to the westbound lane while at the stop sign. The court held that a failure to keep a continuing, proper vigil to the westbound lane (the lane being turned into, not the lane being crossed) was negligent. Thus, *Billow* establishes a duty to continue to observe the

---

**5.** A quick review of the math of the situation reveals that it is not as "plain" as the district court thought that Hollings saw the headlights. The Kleins' experts testified that Mrs. Klein was travelling between 38–40 m.p.h. before applying her brakes. Defendants' experts testified that she was going between 48–50 m.p.h. The speed limit on that portion of the road is 45 m.p.h. The experts agreed that Hollings's turn would have taken about 9–10 seconds and the accident occurred just as Hollings finished his turn. Finally, the parties generally agree that the crest of the hill was between 400 and 500 feet from the intersection. Using these numbers, we can calculate within the reasonable limits a jury would be entitled to infer from the evidence what Mrs. Klein's potential distance from Hollings was at the time he began his turn. In doing so, we will assume the distance from the crest to the intersection is 475 feet and that the turn took 9.5 seconds.

| | | |
|---|---|---|
| Kleins' estimate: | 39 m.p.h. × 9.5 sec. = 543 ft. = 68 ft. from crest |
| Defendants' estimate: | 49 m.p.h. × 9.5 sec. = 683 ft. = 207 ft. from crest |
| At speed limit: | 45 m.p.h. × 9.5 sec. = 627 ft. = 152 ft. from crest |

lane into which the vehicle is turning. If both the district court's and *Billow*'s statements of the law are correct, Hollings would have had a duty to continue to look to both the west and eastbound lanes throughout his turn.

The Kleins rely on *Leasure v. Heller*, 436 Pa. 108, 258 A.2d 855 (1969), where the court stated, "even if the motorist has the right of way, in such a situation [where a left turn is being made across a line of traffic] he must continue to look for oncoming traffic." *Id.* 258 A.2d at 858 (emphasis omitted). *Leasure*, however, is distinguishable. It involved the contributory negligence of a driver who, seeing an oncoming vehicle less than 500 feet away travelling at 50 m.p.h., nevertheless turned in front of that vehicle. *Id.* 258 A.2d at 857. Moreover, the court did not decide *Leasure* solely on the basis of a turn made too close to another vehicle to be executed safely. The plaintiff testified that the last time he looked at the oncoming car was when he was 50 feet away from the point at which he made the turn. *Id.* at 857–58. The court therefore found the driver of the vehicle attempting the turn contributorily negligent because he began his turn without looking again into the lane he was about to cross.

Hollings testified that he did check the oncoming lane as well as the lane into which he was travelling before he started to turn, thus satisfying *Leasure*. Neither *Leasure* nor *Billow* imply a duty to continuously check the lane being crossed after determining that a turn may be made safely and then commencing it. Pennsylvania courts have expressly noted that "a driver ... is not bound to look in all directions simultaneously nor need he 'swivel his head like a ventriloquist's dummy' in order to be free of contributory negligence." *Bascelli v. Bucci*, 244 Pa.Super. 347, 368 A.2d 754, 759 (1976) (citing *Goldenberg v. Watkins*, 191 Pa.Super. 5, 155 A.2d 478 (1959) and quoting *Taylor v. Mountz*, 387 Pa. 321, 127 A.2d 730, 733 (1956)).

Another line of cases, not referred to by the Kleins, have held that when view of the lane that must be crossed is obstructed, the driver pulling out into an uncontrolled highway should continue to look into the lane he is crossing until he can reasonably ascertain that the crossing may be made in safety. In *Lehner v. Schellhase*, 341 Pa. 260, 19 A.2d 91 (1941), the Pennsylvania Supreme Court held, while the northbound plaintiff discharged his duty to look both ways before proceeding into an uncontrolled intersection, the fact that the view of the eastbound lane was partially obstructed by a building and two parked cars created a duty to continue to look when the plaintiff began to cross the eastbound lane. *Higgins v. Jones*, 337 Pa. 401, 11 A.2d 158, 159 (1940) emphasized the need for a motorist with an obstructed view of a lane to be crossed to continue to look into the oncoming lane while executing a turn. In *Riley v. McNaugher*, 318 Pa. 217, 178 A. 6, 7–8 (1935), the Pennsylvania Supreme Court held a plaintiff guilty of contributory negligence in failing to continue a vigil in the oncoming lane while crossing a lane. There, the plaintiff's view while sitting at the stop sign was obstructed by a house and some trees. *See also Helfrich v. Brown*, 213 Pa.Super. 463, 249 A.2d 778 (1968).

These decisions present a special case of the duty to observe the lanes of traffic before moving forward in a reasonable manner. Essentially they hold where a driver cannot see far enough into the oncoming lane to proceed into the road safely, that it remains incumbent on the person making the turn to continue to look down the lane to be crossed as the turn commences. Where a driver's view of the lane he proposes to cross is obstructed, it is plainly unreasonable for that driver to proceed without continuing to look at the oncoming lane until he can see whether there are potential safety threats in it. A driver retains a duty even after stopping and looking before entering an obstructed intersection "to continue to look and to keep his car under such control that he can stop at any moment and avoid a collision." *Id.* 249 A.2d at 781. At some point, however, this duty comes into conflict with the primary duty to look into the lane into which the turn is being made.

■ We do not think Pennsylvania law imposes a duty that would require a driver to look in all directions at all times. Such a rule would impose an impossible feat of ob-

servation. Instead, in a negligence action we ask whether the driver acted reasonably under the circumstances. We think this record shows the substantial evidence presented at the first trial enabled the jury to reach the determination it did on that ultimate fact issue. Hollings did not testify that he looked exclusively to the back of his truck during the turn. He testified that "I was looking towards the back and to the front. It is an ongoing process. You just don't sit there and look towards the back continuously." App. at 28a. He later characterized his lookout as "look[ing] back and look[ing] forward, a glancing kind of ongoing process." 3 Transcript of February 14, 1990 trial at 280. The jury, therefore, had sufficient evidence to conclude that Hollings discharged whatever duty he had to observe the oncoming lane.

■ The evidence upon which the district court relied to find Hollings inattentive, namely that he never saw Mrs. Klein's vehicle until immediately before impact, is also capable of two competing reasonable inferences. The first is that Hollings was inattentive and negligent as the district court held. The second possible inference is that Mrs. Klein approached so quickly that Hollings, exercising reasonable care, never had an opportunity to see her.[6] Either way, verdicts based on either inference after resolution of the conflicts in the evidence on this record in favor of the verdict winner is not bizarre or so strange that it indicates serious injustice. Where evidence is in conflict and subject to two interpretations, the trial judge should be reluctant to grant a new trial. *GBS Meat Indus. Pty. Ltd. v. Kress–Dobkin Co.*, 474 F.Supp. 1357, 1362 (W.D.Pa.1979), *aff'd*, 622 F.2d 578 (3d Cir.1980). The second explanation that Hollings acted reasonably is not inherently implausible, it is supported by the evidence and, because it was the conclusion reached by the jury, we think it should stand.

Recognizing that district courts are entitled to a fair degree of appellate deference when they decide whether to grant a new trial, we hold that here the district court incorrectly substituted its own judgment for that of the jury on Hollings' negligence and the cause of the accident. Pennsylvania law does not impose strict liability on a driver who is involved in an automobile accident outside his or her own lane. The plaintiff must prove negligence. The Kleins were given that opportunity at the first trial and the jury found they had not proved their case. Though the evidence was conflicting, we cannot conclude that the jury's resolution of those conflicts and the inferences it drew in concluding that Hollings acted reasonably shock our conscience or are likely to have resulted in a miscarriage of justice. Accordingly, we hold that the district court erred in granting a new trial.

We will, therefore, vacate the district court's order of November 26, 1990, vacate the judgment entered on October 16, 1991 in the second trial and order the district court to reinstate the jury verdict rendered in the first case.

---

**6.** Hollings's testimony at trial was to that effect. At trial he stated that he was constantly looking forward and back to ensure the truck was headed in the right direction and would not strike anything. When questioned about the implications of the fact that he never saw Mrs. Klein's car the following exchange occurred:

> Q: So for the several seconds the Klein vehicle was travelling westbound on Route 73 approaching your tractor-trailer, you never saw it, did you?
>
> A: I never did see it because it came at a very high rate of speed.
>
> App. at 28a.