Ann M. CUDONE and Daniel Cudone, Plaintiffs,

v.

John F. GEHRET, M.D., and John F. Gehret, M.D., P.A., a Delaware corporation, Defendants.

Civ. A. No. 91–585 MMS.

United States District Court, D. Delaware.

July 21, 1993.

---

See also 821 F.Supp. 266.

Richard A. Zappa, of Young, Conaway, Stargatt & Taylor, Wilmington, DE, for plaintiffs.

Warren B. Burt, of Burt & Burt, Wilmington, DE, for defendants.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

Plaintiffs, Ann and Daniel Cudone, filed suit against John Gehret, M.D., and John F. Gehret, M.D., P.A., alleging medical malpractice in Dr. Gehret's diagnosis and treatment of Ms. Cudone's breast cancer. The case was tried to a jury which rendered a verdict in favor of defendants. Plaintiffs have now moved for a partial new trial on the issues of causation and damages. For the reasons that follow, the Court will order the matter be retried in its entirety.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In October of 1989 Ann Cudone found a lump the size of a pea (approximately 1 cm × 1 cm) in her left breast while performing a self examination. She went to see her gynecologist, Dr. Gehret, within two or three days. Docket Item ["D.I".] 65 at A–3–5.

According to Ms. Cudone, Dr. Gehret felt the lump she brought to his attention, but told her it was merely fibrocystic. *Id.* at A–6. According to Dr. Gehret, he did not feel the lump. D.I. 70 at B–207. In any event, Dr. Gehret did not diagnose Ms. Cudone as having breast cancer in October of 1989.

In July of 1990 Ms. Cudone felt the lump had increased in size. D.I. 65 at A–9. Ms. Cudone was diagnosed as having breast cancer in August of 1990. *Id.* A–30–34. By this time the lump measured 2.2 cm × 3.5 cm × 4.5 cm. Plaintiffs' Exhibit 7. The cancer was found to have spread to one regional lymph node. D.I. 70 at B–74–75.[1] Upon diagnosis Ms. Cudone underwent surgery for a mastectomy. D.I. 70 at B–73–74. She also received chemotherapy as part of her treatment regimen. D.I. 65 at A–34.

Mr. and Ms. Cudone filed suit against John Gehret, M.D., and John F. Gehret, M.D., P.A. ["defendant"] on October 24, 1991, alleging medical malpractice in Dr. Gehret's diagnosis and treatment of Ms. Cudone's breast cancer. The case was tried to a jury from approximately 9:00 a.m. to 3:30 p.m. each day beginning April 26, 1993. On Friday, April 30, 1993 at 12:30 p.m. the jury began deliberations. Later that day the jury completed its first week of duty and was discharged for the weekend at 3:30 p.m., as per the usual schedule. The jury resumed deliberations at 9:00 a.m. Monday May 3, 1993. At 11:35 a.m. that morning, the jury indicated that it could not reach a unanimous verdict in the case. At sidebar, counsel for plaintiff broached the possibility of giving the jury a "dynamite charge," D.I. 69 at F–5, and then withdrew his suggestion. D.I. 69 at F–7–8. The Court, therefore, told the jury, *inter alia*, "I think at this point it is far too early to excuse you. I think you should make additional efforts to attempt to arrive at a verdict. You are excused to go to the jury room." D.I. 69 at F–9. The jury further deliberated through the afternoon. Just as 3:30 p.m. approached, the hour at which the jury would have been discharged for the day and in-

structed to return in the morning to begin their seventh day of service, the jury sent out a note that their deliberations were at an end. The jury had answered the first two questions of a six question verdict form in such manner as to render further deliberation unnecessary. To the first question, "Do you find that the defendant John F. Gehret was negligent in any manner?" the jury responded, "Yes." To the second question, "Did the defendant John F. Gehret's negligence proximately cause any harm to the plaintiff, Ann M. Cudone?" the jury responded, "No."

## II. STANDARD FOR GRANT OF A NEW TRIAL

█ Plaintiffs request the Court to grant a new trial on the issue of causation on the basis that the jury's verdict was against the great weight of the evidence. " 'The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court' . . ." *American Bearing Co., Inc. v. Litton Indus.*, 729 F.2d 943, 948 (3d Cir.) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980)), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). However, where the ground on which a new trial is sought is that the jury's verdict was against the great weight of the evidence, the judge should proceed cautiously, since whenever a new trial is granted on this ground the judge has necessarily substituted his or her judgment, at least to some extent, for that of the jury. *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993). Thus, a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991). This standard for grant of a new trial is less rigorous than the standard for grant of judgment as a

---

1. Ms. Cudone's cancer at that point was classified as T–2, N–1, M–0 or "Stage II." The T–2 designation indicates that the size of the primary tumor placed it in an intermediate size classification category (2 cm to 5 cm). The N–1 designa-tion indicates that the cancer had spread to one regional lymph node by this time. The M–0 designation indicates there was no known metastasis to distant organs.

matter of law. Thus, even where there exists that "minimum quantum of evidence" from which the jury might reasonably find in favor of the nonmoving party, *Dryer v. ARCO Chem. Co.*, 801 F.2d 651, 654 (3d Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987), a new trial may be granted. *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735–36 (3d Cir.1988).

The district court has less discretion in granting a new trial where the subject matter of the suit is "simple and within a layman's understanding," but has greater discretion where the subject matter is complex "such as passing 'upon the nature of an alleged newly discovered organic compound in an infringement action.'" *Klein*, 992 F.2d at 1290 (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90–91 (3d Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). Furthermore, the discretion of the district court judge in granting a new trial is particularly important where the ground for such grant is that the verdict was against the great weight of the evidence because "the district court [is] able to observe the witnesses and follow the trial in a way [the appellate court] cannot replicate...." *Roebuck*, 852 F.2d at 735. *See also Williamson*, 926 F.2d at 1353 (quoting *Roebuck*, 852 F.2d at 735).

## III. DISCUSSION

■ In arriving at its verdict, the jury necessarily determined that although Dr. Gehret was negligent in his treatment of Ms. Cudone, that negligence did not cause any of the three injuries Ms. Cudone alleged she had sustained. A new trial, therefore, should be granted if the Court finds the great weight of the evidence shows Dr. Gehret's negligence caused any one of the three injuries allegedly sustained by Ms. Cudone. Those three injuries were described to the jury in the charge as follows: (1) "Mrs. Cudone's breast cancer was more advanced by the time of its eventual diagnosis"; (2) she required "more extensive treatment than otherwise would have been required"; and (3) the negligence "has placed her more at risk for her breast cancer recurring and having a shortened life expectancy as a result of

said recurrence."[2] The Court will examine the jury's finding as to each injury, seriatim.

## A. CANCER BECAME MORE ADVANCED

Plaintiff's first alleged injury was that defendant's negligence in failing to timely diagnose her breast cancer caused the cancer to become "more advanced by the time of its eventual diagnosis." At the time of diagnosis Ms. Cudone's primary tumor measured 4.5 cm in its longest dimension and had metastasized to involve one regional lymph node. Defendant focuses on the evidence tending to prove or disprove the existence of metastasis to that regional node by the time defendant should have diagnosed Ms. Cudone's cancer in October of 1989. Under plaintiffs' theory of the case, in October of 1989 when Dr. Gehret should have diagnosed Ms. Cudone's lesion, the cancer existed only as a small, approximately 1 cm, tumor with no metastasis to any lymph nodes. Defendant argues the jury's verdict is explained by the fact that they accepted defendant's theory of the case, namely that in October of 1989 the cancer had already metastasized to the node. According to defendant, because by October of 1989 the cancer had already "advanced" to the stage at which it existed when eventually removed in August of 1990 (i.e., primary lesion with involvement of one regional node), the "advance" of the cancer to involve one regional node was in no way related to Dr. Gehret's failure to diagnose and treat Ms. Cudone's cancer in October of 1989. The Court holds such a jury finding to be against the great weight of the evidence.

Five experts testified as to this issue at trial. Four experts testified that to a reasonable degree of medical probability there had been no nodal involvement in October of 1989. The fifth expert testified that it was impossible to say whether or not there was nodal involvement in October of 1989. Dr. Mikund Didolkar, a surgical oncologist, the Director of Surgical Oncology at Sinai Hospital and an Associate Professor of Surgery at Johns Hopkins University, testified that in his opinion in October of 1989 Ms. Cudone

2. There was no objection to this part of the jury charge.

would have been T-1, N-0, M-0.[3] D.I. 70 at B-85. The N-0 designation refers to the fact that none ("0") of the regional lymph nodes would have been cancerous. Dr. Didolkar explained that he arrived at this conclusion because microscopic examination of the cancerous lymph node he removed during Ms. Cudone's surgery revealed a very early form of pathology. The fact that in August of 1990 there was this very early indication of spread to the node, he explained, made it unlikely that cancer would have been present in the node in October of 1989, ten months earlier. D.I. 70 at B-86, B-93.

Dr. Michael Dillon, a gynecological oncologist who teaches and engages in private practice at Johns Hopkins, testified on direct examination that to a reasonable degree of medical probability Ms. Cudone "certainly would have been a T-1, N-0, M-0" in October of 1989. D.I. 66 at C-45. Again, the N-0 designation indicates that no nodes were involved at that time. His testimony on cross examination was the same. D.I. 66 at C-61-62. Dr. James Vogel, an internist with a subspecialty in medical oncology and hematology who teaches at Mount Sinai School of Medicine and at Beth Israel Hospital, also testified that in October of 1989 Ms. Cudone's cancer had not yet spread to any regional lymph nodes. "In 1989 she would have been a—in my opinion, a T-1, N-0, M-0, or Stage 1." D.I. 70 at B-157. Finally, Dr. Marshall Klaven, an obstetrician/gynecologist a Vice-Chairperson of Obstetrics and Gynecology at Hahnemann University and Chairperson of the Department of Obstetrics and Gynecology at Crozer-Chester Medical Center, also indicated Ms. Cudone's cancer had not involved regional lymph nodes in October of 1989 calling her a "Stage I" at that time. D.I. 65 at 94-95.

The one expert whose testimony was not in complete harmony with that of the others was defendant's expert Dr. James Stark. On direct examination Dr. Stark's testimony was as follows:

3. The T-1 designation indicates that the size of the primary tumor would have placed the lesion in the smallest size classification category (tumors less than 2 cm). The N-0 designation refers to the fact that none of the regional lymph

Q. Is there any way you can tell whether the tumor had metastasized to a node in October of 1989?

A. I don't think you can tell that with certainty.

Q. Can you explain that, please.

A. Well, sure. If you—the only way you could know that, really, since this lady was not operated on and you don't have the node in your hand in October of 1989, is to go back and search the medical literature for some guidance as to what the likely situation would have been in her lymph nodes at that time.

Unfortunately, the medical literature is essentially silent on this issue for a very good reason. That is to say, no one willingly, knowingly, would take someone with breast cancer and not treat them. The only way you could get this kind of information, how fast lymph nodes became positive, was to take women and deliberately delay treating them. Since we don't do that in a civilized world, there is no literature that is really relevant to the issue of how fast a lymph node becomes positive. *I don't think that anyone can know with certainly [sic] whether that lymph node was involved with cancer in October of 1989. I don't think it's knowable.*

D.I. 68 at E-12-13 (emphasis added). Again on cross examination he testified:

Q. Doctor, in testifying here today, you're not saying that the cancer that Mrs. Cudone has metastasized in October of 1989, you're saying you—you don't have an opinion one way or the other whether it did or didn't and don't believe it can be determined; is that right?

A. The last is the most appropriate. I don't think it can be determined whether or not she had a lymph node involved in October of 1989.

Q. You're not in here telling us that your opinion is that it did not or it did metastasize?

nodes would have been cancerous. The M-0 designation indicates there would have been no metastasis of the cancer to distant organs. The T-1, N-0, M-0 designation indicates a "Stage I" cancer.

A. That is correct.

D.I. 68 at E–24.

Such testimony is not sufficient to overcome the overwhelming testimony produced that to a reasonable degree of medical certainty Ms. Cudone's lymph node was cancerfree in October of 1989. First, viewing the testimony in the light most favorable to the defendant, Stark's testimony did not directly contradict the opinion given by all the other experts addressing this issue. What he did say, was that he did not know, and felt it was impossible to know, whether the node was cancerous in October 1989 because the literature is silent. At best, and read charitably, his testimony can be viewed as casting some doubt on the certainty of the medical opinion expressed by all the other doctors. However, Dr. Stark's testimony to the intrinsic nature of cancer progression weakens further the charitable meaning attributed by the Court to Dr. Stark's testimony. On cross examination he testified that the nature of cancer is such that the probability of metastasis increases with the passage of time and growth of the primary cancer. D.I. 68 at E–24. This testimony corroborates the opinion expressed by all the other experts. As Ms. Cudone's cancer was just barely at the detectible stage in October of 1989, Stark's testimony would indicate a relatively low probability of metastasis at that time.

Second, Dr. Stark's testimony only goes to the inability to determine metastatic condition by comparison to medical literature. However, at least one expert, Dr. Didolkar, expressly stated a basis for opinion other than comparison to scientific literature. Dr. Didolkar testified that his opinion was based on pathological evidence derived from the excised lymph node and that such pathological evidence caused him to conclude that the node had been cancer-free in October 1989. This evidence stands uncontradicted.[4]

In summary, the jury's verdict cannot be explained by claiming the jury credited defendant's theory of the case over plaintiffs'. If the jury did so, it acted against the great weight of the evidence. Dr. Didolkar's testimony that the node found to be cancerous in August of 1990 would not have been cancerous in October of 1989 stands uncontradicted and unimpeached. In light of this the jury should not have found that the node could have been cancerous in October 1989. Further, the great majority of expert testimony repeatedly stated that to a reasonable degree of scientific certainty the node was not cancerous in October of 1989. For the jury to equate a lone opinion, that it is impossible to determine whether or not the node was cancerous in October of 1989, with a finding that the node was cancerous in October of 1989, not only renders the jury's verdict against the great weight of the evidence but shocks the conscience of this Court. A new trial will be ordered on this ground.

## B. MORE EXTENSIVE TREATMENT REQUIRED

Defendant also asserts the jury's finding of no proximate cause is supportable on the issue of whether his negligence caused Ms. Cudone to undergo more extensive treatment than would have been needed if he had properly diagnosed her breast cancer in October of 1989.[5] Ms. Cudone's treatment upon diagnosis in August of 1990 included a mastectomy, reconstructive surgery and chemothera-

---

**4.** In addition, although the parties do not argue it, the Court seriously questions how any reasonable jury could determine Ms. Cudone's cancer did not "advance" significantly after October 1989. There was absolutely no dispute that in October of 1989 the size of her primary tumor was approximately the size of a pea or smaller (approximately 1 cm by 1 cm or less) and that upon removal in August of 1990 it measured 3.5 cm × 4.5 cm × 2.2 cm. Plaintiffs' Exhibit 7. Her cancer, therefore, can be said to have advanced in that it grew from a small lesion to a much larger one due to Dr. Gehret's failure to diagnose. This increase in size changed the medical designation of the tumor from N–1 (de-

noting tumors smaller than 2 cm) to N–2 (denoting tumors of 2 cm to 5 cm). Such "advance" in size and designation makes it difficult to accept that Dr. Gehret's failure to diagnose Ms. Cudone's cancer in October of 1989 did not proximately cause her cancer to advance.

**5.** It should be noted that plaintiffs' theory that Ms. Cudone required more drastic therapy due to Dr. Gehret's negligence is based on the assumption that if Dr. Gehret had properly diagnosed Ms. Cudone's cancer in October of 1989, the stage of the cancer at the time would have been such that no nodes would have been involved.

py. Defendant must therefore demonstrate there was evidence which showed that even if defendant had diagnosed Ms. Cudone's cancer in October of 1989 she would have still undergone a mastectomy and reconstructive surgery (rather than merely a lumpectomy as plaintiff argued) and would have had to undergo similar chemotherapy. No such demonstration can be made on the record.

There was conflicting evidence as to whether Ms. Cudone would necessarily have undergone the same chemotherapy regimen if defendant had diagnosed her cancer in October of 1989. Plaintiffs' experts Dr. Didolkar and Dr. Gordon testified that if her cancer had been diagnosed in October 1989 when it was T–1, N–0, M–0 chemotherapy would not have been administered. D.I. 66 at C–111; D.I. 70 at B–87, B–117. Defendant's expert Dr. Stark testified that if Ms. Cudone had been T–1, N–0, M–0 in October 1989 he believed she would have needed chemotherapy anyway. D.I. 68 at E–15. From this conflicting evidence the jury could have found that Ms. Cudone's treatment in terms of chemotherapy would not have differed irregardless of defendant's negligence.

The opposite conclusion, however, is mandated as to the surgical portion of Ms. Cudone's treatment. Plaintiffs' expert Dr. Didolkar testified that if Ms. Cudone's cancer had been diagnosed in October 1989 before it had spread to any regional nodes, no mastectomy would have been required. Dr. Didolkar opined that the much less drastic surgical procedure known as a "lumpectomy" would have been all that was required under those conditions and as a result, Ms. Cudone would not have needed any reconstructive surgery. D.I. 70 at B–86. None of defendant's experts contradicted this testimony.

The Court finds that plaintiffs presented evidence that Dr. Gehret's failure to diagnose Ms. Cudone's cancer in October of 1989 before it had spread to any regional nodes caused Ms. Cudone to undergo more extensive surgical treatment than would have been necessary in the absence of such failure. As this evidence was uncontroverted, the jury should have found Dr. Gehret's negligence caused Ms. Cudone to suffer more extensive treatment. The jury's verdict, however, necessarily implies that it reached a contrary conclusion. For this reason, plaintiff's motion for a new trial on this ground must be granted.

## C. INCREASED RISK

The third injury allegedly sustained by Ms. Cudone was an increase in the risk that her cancer will recur. Plaintiffs contend that if defendant had properly diagnosed Ms. Cudone's breast cancer in October of 1989 the probability that her cancer would recur after treatment would have been very low. According to plaintiff, the probability that her cancer will recur is now dramatically higher because of the late date at which diagnosis and treatment finally occurred.[6] Defendant asserts there is evidence to support what he posits was the jury's conclusion that Dr. Gehret's negligent failure to diagnose and treat Ms. Cudone's cancer in October of 1989 did not result in any increase in the risk that Ms. Cudone's cancer will recur. The Court agrees with defendant.

Plaintiffs did present compelling evidence that Ms. Cudone suffered a drastic increase in the risk that her cancer will recur as a result of Dr. Gehret's negligent failure to diagnose. Dr. Klaven testified that if Ms. Cudone's cancer had been diagnosed in October 1989 when there was no nodal involvement her chance of recurrence would have been approximately 5%–8%, but that her present risk of recurrence is 35%–40%. D.I. 65 at A–95–96. Dr. Didolkar testified that if her cancer had been diagnosed in October 1989 under T–I, N–0, M–0 conditions her chance of recurrence would have been 25%–30% or less. He placed her present chances of recurrence at 50%–60%. D.I. 70 at B–88. Finally, Dr. Vogel testified Ms. Cudone's risk of recurrence would have been up to 25% if her cancer had been diagnosed in October 1989, but that because diagnosis did not oc-

---

6. As noted in the previous section, plaintiffs' theory that Ms. Cudone experienced an increase in risk of recurrence is based on the assumption that if Dr. Gehret had properly diagnosed Ms. Cudone's cancer in October of 1989, the stage of the cancer at the time would have been such that no nodes would have been involved.

cur until August 1990, there is now a 55% chance that her cancer will recur. D.I. 70 at B–158.

Defendant presented two experts on the issue of increased risk of recurrence, Dr. Robert Baker and Dr. Stark. Dr. Baker testified that if Ms. Cudone had been T–1, N–0, M–0 in October of 1989 her risk of recurrence at that time would have been approximately 20% but that her present risk is at least 50%. D.I. 67 at D–60–61. Thus, Dr. Baker's testimony is aligned with that of plaintiffs' expert, Dr. Vogel. In contrast, Dr. Stark testified that he would place Ms. Cudone's present risk of recurrence at only 20% and that if there had been some cancer present in the node in October of 1989 he believed her prognosis at that time would have been virtually the same as it is today, i.e. 20%. D.I. 68 at E–13–14. Dr. Stark also supported defendant's theory in a second way. He testified that even assuming Ms. Cudone had been T–1, N–0, M–0 in October 1989, i.e., no cancer in the node, her risk of recurrence would not have been very different from present, placing it at 5%–10%.

Defendant's evidence is sufficient to withstand plaintiffs' motion for a new trial predicated on this ground. First, the testimony of defendant's expert, Dr. Stark, directly contradicted plaintiffs' (and one of defendant's) experts thereby creating an issue of expert credibility which is ill suited to judicial intrusion. Second, unlike defendant's arguments as to Ms. Cudone's first alleged injury, i.e., the advancement of the cancer between October 1989 and August 1990, there is no overwhelming consensus among plaintiffs' experts. On the prior issue each expert, except Dr. Stark, gave the same bright line answer to the same black and white question: Was there any nodal involvement in October 1989?—"No." And the one expert not in line with the others, Dr. Stark, did not answer, "Yes." On the instant issue each expert assigned different statistical ranges to Ms. Cudone's risk of recurrence in October and in August. The jury is permitted to take such differences into consideration when weighing the evidence. The Court finds sufficient support for the jury verdict on issue.

This ground will not support plaintiffs' motion for a new trial.

## IV. CONCLUSION

Defendant has advanced various explanations of the jury's verdict. The Court finds sufficient evidence in the record to support defendant's explanations as to how Dr. Gehret's negligence in failing to diagnose Ms. Cudone's cancer did not result in an increase in the risk that her cancer will recur. The Court finds, however, that the jury's determination that Dr. Gehret's negligence did not cause Ms. Cudone's cancer to become more advanced was against the great weight of the evidence. That jury determination also shocks the conscience of the Court. The Court also finds that the jury's determination that Dr. Gehret's negligence did not cause Ms. Cudone to undergo more extensive treatment was against the great weight of the evidence.

Plaintiffs have urged that if a new trial is granted, the jury finding that Dr. Gehret breached his duty of care should be taken as established for purposes of a second trial. The issues of what the duty of care was and whether it was violated were not only hotly contested, but in my view, neither plaintiffs nor defendant could confidently predict what the jury would decide on that issue. Given the jury's inexplicable answer to the interrelated question of causation, a new trial should be granted in its entirety. *Gasoline Products Co., Inc. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931) (partial, rather than full, new trial should not be granted where the issue to be retried is interwoven with the issues proposed to be left standing).

An order will issue in conformity with this opinion.