**CHINA RESOURCE PRODUCTS (U.S.A.) LTD., Plaintiff**

v.

**FAYDA INTERNATIONAL, INC., CPM Industries, Inc., S.H. Tseng, B.E. Kidner and L.L. Yowell, Defendants.**

Civ. A. No. 90–159–JLL.

United States District Court, D. Delaware.

June 22, 1994.

John T. Dorsey of Richards, Layton & Finger, Wilmington, DE, and Kathleen M. Kundar, Eduardo L. Tabio, and Victor Rivera of Fox & Horan, New York City, of counsel, for plaintiff.

Raymond M. Radulski, of Wilmington, DE, for defendants Tseng and Kidner.

James F. Kipp of Trzuskowski, Kipp, Kelleher & Pearce, and Thomas R. Kellogg of CPM Industries, Inc., Wilmington, DE, for remaining defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

On April 6, 1990, plaintiff China Resource Products (U.S.A.) Ltd. ("China Resource") filed a breach of contract action to recover damages of $500,567.39 from defendant Fayda International, Inc. ("Fayda"). (Docket Item "[D.I.]" 1.) On June 2, 1989, China Resource contracted with Fayda to deliver 187 metric tons of aluminum rods at a price of $2,675 per metric ton ("Aluminum Contract"). (Id., ¶¶ 5, 6.) China Resource alleged that it had shipped 187.128 metric tons of aluminum on June 28, 1989 and July 5, 1989, but Fayda has never paid for the aluminum. (Id., ¶¶ 10–12.)

On April 1, 1992, China Resource filed an amended complaint incorporating new defendants and new claims and changing the amount of recovery to $374,256.00. (D.I. 62.) In its amended complaint, China Resource alleged that the principles of Fayda, Shirley H. Tseng ("Tseng"), Barrett E. Kidner ("Kidner") and Leonard L. Yowell ("Yowell") had entered into a "Letter of Intent" whereby all of Fayda's assets were to be transferred to CPM Industries, Inc. ("CPM"), which is owned by Yowell and his son. (Id., ¶ 21.) Based on the facts surrounding this Letter of Intent, China Resource added a number of claims against the various defendants to recover the contract price for the aluminum: (1) breach of contract against CPM alleging that CPM had assumed Fayda's duty to pay China Resource for the aluminum rods; (2) fraudulent transfer against all of the defendants; and (3) civil conspiracy against all of the defendants. (D.I. 62.) In addition, China Resource sought to recover from CPM the remaining $30,000.00 due on a contract for titanium dioxide ("titanium contract"). (Id.)

Trial was originally set to commence on November 29, 1993, but due to the complicated nature of the case and the parties' inability to narrow the focus of the litigation, this Court found it necessary to cancel the trial. (D.I. 131.) In June or July of 1993, defendant Yowell was discharged in bankruptcy. (D.I. 156, p. 68.) On January 24, 1994, this Court entered default judgment against Fayda for the breach of aluminum contract claim. (D.I. 134.) On February 3, 1994, this Court filed a supplemental pretrial order separating the claims for trial pursuant to Rule 42(b). (D.I. 35.) From April 18 to April 19, 1994, a jury tried the following claims: (1) fraudulent conveyance of Fayda's assets against CPM, Fayda, Tseng and Kidner; (2) civil conspiracy against CPM, Fayda, Tseng and Kidner; and (3) breach of the titanium contract against CPM, and CPM's counterclaim against China Resource for overpayment. (Id.)

On April 19, 1994, the jury returned its verdict sheet, pursuant to Rule 49, Fed. R.Civ.P., which provided answers to special interrogatories with respect to each of the distinct claims asserted by the plaintiff in his complaint. (D.I. 149.) Specifically, the jury found that there was a fraudulent conveyance of Fayda's assets and that CPM and Yowell had participated in the conveyance but not Tseng or Kidner. Accordingly, the jury returned a verdict in favor of China Resource and against CPM in the amount of $374,564.00 plus interest. (Id.) The jury found that there was no civil conspiracy. (Id.) Finally, the jury determined that CPM breached the titanium contract and returned a verdict in favor of China Resource and against CPM in the amount of $30,000.00 plus interest. (Id.) The jury denied CPM's counterclaim for overpayment. (Id.)

As to the fraudulent conveyance verdict, the defendant CPM has filed a motion for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50(b), or in the alternative for a new trial pursuant to Federal Rules of Civil Procedure 59. (D.I. 153.) CPM makes no motion in regard to the titanium dioxide verdict. For the reasons set forth below, this Court denies both motions and will permit the jury verdict to stand.

## II.  DISCUSSION

### A.  CPM's Motion For Judgment As A Matter Of Law [1]

■ This Court must deny a motion for judgment as a matter of law unless the record is "critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief." *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 692 (3d Cir.1993).  In making this determination, "[t]he reviewing court must give the non-moving party, 'as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him.'" *Smith v. Delaware Bay Launch Service, Inc.*, 842 F.Supp. 770, 774 (D.Del.1994) (citing *Garrison v. Mollers North America, Inc.*, 820 F.Supp. 814, 818–19 (D.Del.1993)).  In addition, "the court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury." *Parkway*, 5 F.3d at 691.  In other words, "the court should grant the motion for a judgment as a matter of law only if, 'viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor.'" *Smith*, 842 F.Supp. at 774–75 (citing *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir.1993)).

Defendant CPM argues that this Court should set aside the jury's verdict for two reasons: (1) that no jury could find the defendants CPM and Yowell liable and at the same time absolve defendants Tseng and Kidner of fraudulent conveyance; and (2) that no jury could determine that the value of the assets transferred was over $249,-000.00.

### 1.  Fraudulent Conveyance

■ As to fraudulent conveyance, this Court instructed the jury that:

> If you do find such intent [to delay, hinder or defraud], you may find the defendants CPM, Fayda, Ms. Tseng and Mr. Kidner jointly and severally liable for the value. . . .
>
> Alternatively, if you find that China Resource did not prove the requisite intent, you may still find that there was a fraudulent conveyance if China Resource proves by a preponderance of the evidence . . . [three elements necessary for constructive fraudulent conveyance]. . . .  If you determine that China Resource has proven these three elements, then you *must* find CPM, Fayda, Ms. Tseng and Mr. Kidner, jointly and severally liable . . ., whether or not you believe that Fayda, CPM, Ms. Tseng and Mr. Kidner actually intended to defraud Fayda's creditors.

(D.I. 152, pp. 46–48.)  CPM argues that in light of this instruction no jury could "find one of the defendants responsible and the others not responsible for the transfer" because of the use of the word "must."  (D.I. 154, p. 8.)  This interpretation of this Court's instructions is clearly erroneous.  This instruction did not mean that if the three elements were met, the jury must find all defendants liable, only that if the three elements were met that there was a fraudulent conveyance even though there was no intent.  In addition, on the verdict sheet it was clear that the jury could find that some of the defendants knowingly participated in the fraudulent conveyance while others did not.[2]  It is obvious that a party cannot be held

---

1. The defendant refers to a motion pursuant to Rule 50(b) as a "judgment N.O.V."  Pursuant to the 1991 amendments, a motion under Rule 50(b) was renamed a "judgment as a matter of law."

    [P]rior to the 1991 amendments to the Federal Rules of Civil Procedure, a motion under Rule 50(b) was called a motion for judgment notwithstanding the verdict while a motion under Rule 50(a) was called a motion for a directed verdict.  The amendments adopted the common terminology of "judgment as a matter of law" for both subsections (a) and (b) of Rule 50. . . .  In noting the "common identity" of

motions made under subsections (a) and (b) of Rule 50, the Advisory Committee implicitly approved the longstanding authorities that held that the standards for the granting of judgment n.o.v. were identical to those for direction of a verdict.

5A James Wm. Moore, *et al., Moore's Federal Practice* ¶ 50.07[2], at p. 50–74 to 50–75 (1993).

2. The verdict sheet read: "2.  State which of the following knowingly participated in the fraudulent conveyance by checking the appropriate blank beside each name."  (D.I. 149.)

liable when he did not knowingly participate in the fraudulent conveyance. To instruct the jury otherwise would have been an error on the part of this Court.

■ CPM further argues that "to find CPM alone responsible for the transfer is to ignore the fact that there must be a transferor as well as a transferee to accomplish a transfer." (*Id.*, p. 18.) However, the jury did not find that CPM accomplished the transfer alone; it found that Yowell, as an officer of Fayda, transferred the property to CPM. (D.I. 149.) This Court cannot enter a judgment against Yowell because of his discharge in bankruptcy, but this fact does not mean that Yowell is a nonentity for all purposes.

■ Finally, CPM argues that because Fayda was the legal owner of Fayda's assets, its officers:

> either affirmatively placed CPM in control of the balance of the shipment or allowed CPM to assume control of the shipment for Fayda's benefit without interference. No other inference is possible from the testimony. Had Mr. Kidner and Ms. Tseng really opposed CPM's course of conduct with respect to the Aluminum rods there

3. There may be a multitude of reasons why a person chooses not to institute a legal action. By giving legal significance to a person's decision not to file an action, this Court would be encouraging, if not requiring, everyone with any possible legal action to file a suit to protect their rights in later proceedings. This Court is not willing to do so. On the other hand, this Court cannot agree to the following argument made by CPM at the end of trial:

> China Resource was offered an amount in settlement of this whole matter which is quite fairly close to its invoice of $374,000. It was offered 309,000 over a period of time by CPM. It just refused to deal completely. It could have come back and said, Well, we would like more. We would like it sooner. We will settle. If you can pay us the whole 374,000, we will take it in two years. They could have dealt reasonably with CPM. They chose not to deal at all. I think that they are, themselves, responsible for their own predicament and not Mr. Yowell.

(D.I. 156, p. 83.) This Court will not penalize the plaintiff for its refusal to settle. Our legal system does not require plaintiffs to compromise their legal rights.

4. Tseng testified that:

are several legal steps they could have taken. They did not have to just stand idly by as they testified.

(D.I. 154, p. 8.)

The fact that Fayda had legal title to its assets does not necessarily mean that its officers participated in the transfer or were even aware of the transfer of these assets. Yowell was also an officer of Fayda and after September or October of 1989, the books and records of Fayda were transferred to CPM. (D.I. 155, p. 162.) In addition, the inference that Tseng and Kidner were participants in the transfer because they did not take any legal steps to stop the transfer is not the only inference the jury could have drawn.[3] The jury could have concluded that Tseng and Kidner were not even aware of the transfers, and that Yowell, as an officer of Fayda, accomplished the transfers alone. In fact, Tseng testified that they had no knowledge of the transfer of Fayda's assets.[4] (D.I. 155, pp. 108, 120.) The testimony shows that Yowell accomplished these transfers by merely instructing the warehouse to transfer title of Fayda's assets from Fayda to CPM. (*Id.*, p. 132; D.I. 156, pp. 54–55.)[5]

> A: I am not aware of the transfer [of the aluminum rods] in December. I find that out later on.
>
> A: ... As soon as we signed this document, and Mr. Yowell just transferred the TiO2 to CPM without us even knowing it. By "us," I mean Barrett and I knowing it.

(D.I. 155, pp. 108, 120.)

5. Yowell testified that:

> Q: And isn't it true that in early January of 1990 you contacted the Apollo Warehouse and told them to release the titanium dioxide, the 199 tons of titanium dioxide, release that from the name of Fayda to CPM?
> A: I enclosed roughly a six or seven thousand dollar check in arrears and requested they do so, saying CPM would be responsible for that, yes.
> Q: And, in fact you were the person who contacted the warehouse or someone at your behest contracted the warehouse?
> A: That's correct.

(D.I. 156, p. 52.) *See also* Tseng 5. (This Court will refer to the plaintiff's exhibits as "PX #", defendant CPM's exhibits as "CPM #", and defendant Tseng's exhibits as "Tseng #".)

As to the aluminum rods, Yowell testified that:

## 2. Award of Damages

A fraudulent transferee is liable to the full extent of the value, at the time and place of transfer, of the property fraudulently conveyed. *Unemployment Comp. Comm'n v. George W. McCaulley & Son, Inc.*, 26 Del.Ch. 113, 22 A.2d 862, 864 (1941). CPM argues that no reasonable jury could have awarded a verdict of $374,564.00 because the only value of the aluminum rods in evidence was the value of $249,000.00 in the Letter of Intent.[6] (PX 22.) It argues that it should only be liable for the aluminum it received and since it did not receive all of the aluminum, it should not be liable for all of the aluminum. However, CPM fails to realize that more than just the aluminum was transferred; all of Fayda's assets were transferred, including the proceeds from the aluminum already sold.[7] According to the Letter of Intent, the value of Fayda's assets, including the aluminum and aluminum proceeds, was $547,000.00.

Nevertheless, CPM argues that only the value of the aluminum, at the time and place

Q: But, in some fashion, you accomplished the sale of those aluminum rods; is that correct?
A: That is correct.
Q: Either through a change of title similar to this document relating to the TIO2 or simply by calling the warehouse and saying, This is Leonard Yowell at Fayda, release so many tons of aluminum rods to so and so, bill and have the customer billed by CPM; is that correct?
A: With the exception that you said I did that. The same person who was handling the aluminum sales for Fayda, Jim Sullivan, continued to make the same arrangements and continued to make the same sales for CPM throughout this same period. He was in direct contact with the warehouse.
. . . .
Q [the Court]: . . . are you saying by inserting Mr. Sullivan in the picture, whose name we have never heard before, that you had nothing to do with that whatsoever?
A: No, sir. I was completely aware of it. (D.I. 156, pp. 54–55.)

**6.** The Letter of Intent listed the assets as:

| | | |
|---|---|---|
| a.) | Cash on hand | $ 8,000 |
| b.) | Aluminum accounts receivable | 25,000 |
| c.) | TiO2 accounts receivable | 10,000 |
| d.) | Aluminum inventory at $.80/lb less 2% commission and 2.5% duty (327,000 × $.76) | 249,000 |

of transfer, is relevant to China Resource's recovery. Even assuming that only the value of the aluminum rods is at issue, the $374,564.00 figure is not unreasonable. According to the Letter of Intent, the aluminum inventory is valued at $249,000.00 and the aluminum accounts receivable is valued at $25,000.00. Based on CPM's argument, China Resource is entitled to a minimum of $274,000.00. However, this is only a minimum. It would have been reasonable for the jury to infer that Yowell's figures were merely book values and the actual saleable value was higher. When asked about the $249,000.00 figure for the aluminum rods, Yowell testified that that figure was the saleable price. (D.I. 156, p. 30.) However, when asked if the $255,000.00 figure in the Letter of Intent for the titanium was the sale value, he testified that the actual value would be higher. (*Id.*, p. 31.) The jury may have reasonably concluded that the actual value of the aluminum was also higher than the listed price.[8]

| | | |
|---|---|---|
| e.) | TiO2 inventory at cost less TiO2 receivable | 255,000 |
| | TOTAL ASSETS | 547,000 |

(PX 22.)

**7.** As to the cash on hand and aluminum and titanium receivables, both Tseng and Kidner testified that they did not know whether these were transferred to Yowell. (D.I. 155, pp. 118–19, 161.) Yowell testified that he had never transferred these funds. (D.I. 156, p. 40.) However, the Letter of Intent clearly stated that these funds were to be transferred from Fayda to CPM. (PX 22.) In light of the fact that Yowell had control of the books and the aluminum and titanium inventories had been transferred, it was reasonable for the jury to infer that these receivables were also transferred.

**8.** Yowell's testimony concerning the listed value of the aluminum and titanium dioxide inventories was consistent with two interests he had in the litigation: (1) to show that no fraudulent transfer occurred, specifically that Fayda was solvent at the time of the transfer, and (2) to show that if there was a fraudulent transfer of the aluminum rods, the value of the aluminum be as low as possible. It would have been to Yowell's advantage to testify that the titanium had a higher value than that listed in the Letter of Intent; a higher value could mean that Fayda was solvent at the time of the transfer. However, believing that CPM would only be liable to the extent of the value of the aluminum but not the titanium if the jury found that the conveyance

Having concluded that the value on the Letter of Intent was low, the jury could have reasonably concluded that $374,564.00 was the true value. The jury was presented with three alternative values: (1) the $500,225.00 contract figure; (2) the $500,000.00 aluminum invoice figure listed as a liability in the Letter of Intent; and (3) the $374,265.00 aluminum invoice figure.[9] (PX 9, 12, 13, 22.) In light of these alternative figures, this Court cannot conclude that the jury's verdict was "not supported by legally sufficient evidence." *Parkway Garage*, 5 F.3d at 692.

### B. CPM's Motion For New Trial

■■■ Under Federal Rule of Civil Procedure 50(b),[10] a party who moves for a judgment as a matter of law may move in the alternative for a new trial. As this Court has recently stated in *Smith*, "if a court denies a motion for judgment as a matter of law, the party still has an opportunity to prevail on a motion for a new trial." *Smith*, 842 F.Supp. at 778. Rule 59(a) governs the standard for granting a new trial and states in relevant part:

> [a] new trial may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons which new trials have heretofore been granted in actions at law in the courts of the United States. . . .

Fed.R.Civ.P. 59(a)(1). "Among the firmly established grounds for granting a new trial at common law are that the jury's verdict is against the weight of the evidence and that the jury's damage award is excessive." *Garrison*, 820 F.Supp. at 820. In addition, the improper exclusion of evidence, if prejudicial, and an improper submission of a material

issue to the jury are also grounds for a new trial. *See Petree v. Victor Fluid Power, Inc.*, 887 F.2d 34, 41 (3d Cir.1989); 6A James M. Moore *et al., Moore's Federal Practice*, ¶ 59.-08, at pp. 59–82 to 59–84. A trial court has discretion as to whether or not to grant a new trial, and that decision will only be disturbed for an abuse of discretion. *Roebuck v. Drexel University*, 852 F.2d 715, 735 (3d Cir.1988). It is also well established that a trial court may grant a new trial even though it has denied a motion for a judgment as a matter of law. *Id.* at 735–36.

However, when a trial court is considering whether the verdict is against the weight of the evidence, the Third Circuit has warned that:

> [w]hen the district court grants a motion for a new trial based on the weight of the evidence, the court has:
>
> > to some extent at least, substituted [its] judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts . . .

*Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993) (citing *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)). Therefore, a "new trial should only be granted where a 'miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or where the verdict 'shocks our conscience.' " *Smith*, 842 F.Supp. at 778 (citing *Cudone v. Gehret*, 828 F.Supp. 267, 269 (D.Del.1993)).

---

was fraudulent, it was to Yowell's advantage to testify that the $249,000.00 was the sale value, not a lower book value. In addition, it was to Yowell's advantage at the time he drafted the Letter of Intent to use the lowest possible values for the inventory because doing so would have been to his advantage with respect to the transaction he was conducting with Tseng and Kidner at that time.

9. The defendant makes much of the fact that one of the plaintiff's witnesses had testified that "the market for aluminum at that time when they got

the material was softer than the time when we booked the material at a fixed price." (D.I. 155, p. 89.) However, the jury could have reasonably concluded that such a drop in the market could have accounted for the price difference between the contract and invoice prices.

10. Fed.R.Civ.P. 50(b) provides in relevant part: "[a] motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative." Fed.R.Civ.P. 50(b).

CPM moves for a new trial on the grounds that: (1) the verdict is against the weight of the evidence; (2) the verdict is excessive;[11] (3) this Court had erroneously excluded the evidence of Andrew Lubin, CPM's expert witness as to the value of the aluminum rods; and (4) this Court erroneously permitted defendants Tseng and Kidner to present issues not included in the scope of the pretrial order.

### 1. Fraudulent Conveyance Elements— Verdict Against the Weight of the Evidence

■ CPM argues that the jury had not followed the jury instructions and that China Resource had failed to prove the elements of fraudulent conveyance. This Court does not agree. The burden of persuasion is with the proponent of the position that the conveyance was fraudulent. *United States v. West*, 299 F.Supp. 661, 664 (D.Del.1969); *Mitchell v. Wilmington Trust Co.*, 449 A.2d 1055, 1060 (Del.Ch.1982), *aff'd*, 461 A.2d 696 (1983). In this case, the plaintiff met this burden of proof: (1) the plaintiff proved that there was actual intent to fraudulently convey; and (2) in addition, the plaintiff proved that there was a constructive fraudulent conveyance. Del.Code Ann. tit. 6, §§ 1304–1307 (1993).

### a. Actual Intent

■ Section 1307 reads that:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Del.Code Ann. tit. 6, § 1307.

The Delaware Courts have construed the subjective prerequisite of "actual intent" to mean that of the grantee as well as the grantor. *Mitchell*, 449 A.2d at 1060. Since actual fraudulent intent is rarely susceptible to direct proof, it is normally proven by circumstantial evidence.[12]

In this case, there is no direct evidence of Yowell's subjective intent. CPM argues that the weight of the evidence shows that there was no intent. It proposes that the transfer was part of an effort by Tseng, Kidner and Yowell to sever their business relationships, not to defraud China Resource. To support this theory, CPM points to evidence that CPM would have been in a better position than Fayda to handle the liabilities and to evidence that China Resource knew of CPM's proposal to assume Fayda's liability. In addition, Yowell explains that CPM's failure to pay China Resource was due to supposed breaches by China Resource and Tseng.

However, it is proper for a jury to disregard the parties' version of the facts and adopt another version of the facts based on evidence. There was credible evidence that although China Resource knew of CPM's proposal to assume Fayda's liabilities, China Resource had also specifically denied any such proposal with respect to the aluminum rods. In a letter dated December 27, 1989, G.L. Zhao wrote to Fayda Corporation, to Yowell's attention, that:

> our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. When we so discover it, the searchlight of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodsman follows his game by slight indications, as a broken twig or a displaced pebble, so fraud may become apparent by innumerable circumstances, individually trivial ... but in their mass "confirmation strong as proofs of holy writ."
> *Montana National Bank v. Michels*, 193 Mont. 295, 631 P.2d 1260, 1262 (1981).

11. This Court will not discuss this argument. As discussed above, this Court finds that there is ample evidence to support the jury's verdict amount.

12. The difficulty of proving actual intent is eloquently and biblically characterized as the following:
   Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know "when it cometh and whither it goeth." It "loveth darkness rather than light, because its deeds are evil." It is rarely that we can lay

As for aluminum rods, your previous proposal is definitely unreasonable and we request you to pay the full amount of the invoice plus interest *immediately*. We also hold you fully responsible for any further delay. Your *immediate* attention is required.

(CPM 4) (emphasis added). Yowell was aware that China Resource wanted to be paid immediately and intended to look to Fayda, not CPM, for payment of the aluminum invoices. In spite of this knowledge, Yowell took control of the aluminum rods, sold them, and kept the proceeds in CPM's treasury. Yowell carried out these activities without anyone's knowledge [13] and left Fayda with no assets and China Resource with no recourse.[14] From these facts, a jury could have determined that Yowell actually intended to defraud China Resource.

Even if Yowell and CPM intended to pay China Resource back at some point, there was also credible evidence that Yowell and CPM intended to delay or hinder China Resource's recovery. "Actual intent" does not require that the creditor show that the parties actually never intended to pay his debts; it is enough to show that the parties intended to "delay, hinder and obstruct his creditors." *Haggerty v. Wilmington Trust Co.*, 22 Del. Ch. 152, 194 A. 134, 136 (1937). At trial, Yowell admitted that he was mostly interested in the titanium dioxide; that the titanium dioxide was "the cherry on the pie." (D.I. 156, p. 42.) In fact, CPM had a contract dated January 5, 1990, to supply a million pounds of titanium dioxide to a corporation named "Chi–Vit" over a period of a year.[15] (D.I. 156, pp. 42–45; Tseng 3.) In order to meet the requirements of this contract, he needed a long term supply of titanium dioxide and approached China Resource concerning a long term supply.[16] In an effort to sever all ties with Yowell and CPM, China Resource found him a source for 1200 MT of titanium dioxide at a price of 1,240 with the condition that Yowell open a letter of credit within 45 days of shipment. (D.I. 155, p. 96; PX 51, 52.) For whatever reason,[17] CPM never opened the letter of credit. (D.I. 155, pp. 97–99.)

At all times, it was clear that the aluminum and titanium invoices were separate. A December 27, 1989 letter from China Resource to Fayda, attention Yowell, stated that "we wish to separate these two products for dis-

---

13. As noted above, neither Tseng nor Kidner were aware of this transfer. *See supra* n. 4. In addition, Zhao, an officer of China Resource, testified that China Resource was not even aware of the transfer until two years after the aluminum rods were transferred. (D.I. 155, p. 83.)

14. At trial, Tseng read to the jury a part of her December 1992 deposition:

He [Yowell] took everything out of Fayda International. He left Fayda International with all the liability.... Sure, he returned his 25 percent, so he did not have to take any responsibility....

(D.I. 155, p. 114.)

15. Initially, Yowell denied that he had such a customer:

Q: Was it not true that, when you agreed to take over this onerous problem involving the titanium dioxide, that you already had a customer waiting in the wings to buy that material?
A: That is obviously not true.

(D.I. 156, p. 42.) Although the titanium was transferred on December 28, 1989, the jury could certainly have inferred that Yowell knew of Chi-Vit when he met with Tseng and Kidner on December 28, 1989. In a letter dated December 22, 1989 Yowell wrote to Zhao that "CPM has

developed a market for up to 200 MT/month of this material subject to confirmation in January." (CPM 3.) On January 5, 1990, Chi–Vit placed a blanket order, confirming a verbal order, for one million pounds of titanium dioxide. (Tseng 3.) Since neither Tseng nor Kidner was aware of this contract, (D.I. 155, p. 135), the jury could have inferred that Yowell and CPM never intended to pay on the aluminum invoices; Yowell merely agreed to pay the aluminum invoices so that he could get the titanium dioxide.

16. Yowell testified that:

Q: In other words, you had the opportunity to sell to them more than just the 200?
A: That is correct.
Q: In fact, that's why you took the effort you did to get more titanium from China Resources; isn't that correct? You got Mr. Zhao to help you find a source?
A: That was certainly the attraction, the intent and purpose throughout. Yes, sir.

(D.I. 156, p. 46.)

17. Zhao testified that CPM did not open a letter of credit "because when they started to ship the material in the market for titanium dioxide, it came lower and they never opened the L/C for the new purchase." (D.I. 155, pp. 98–99.)

cussion."[18] A December 28, 1989 letter from Yowell to China Resource clearly stated that Yowell understood China Resource's desire to separate the two invoices.[19] However, Yowell took control of the aluminum bars and sold them. He then used the aluminum invoices as a bargaining chip to obtain titanium dioxide supplies on his terms. After he failed to open the letter of credit required by the contract obtained by China Resource, Yowell approached Tseng. Yowell asked Tseng to obtain a source for titanium dioxide for CPM, and Tseng accepted with the understanding that Yowell would use the proceeds from the titanium dioxide sales to pay off the aluminum invoice.[20] Upon this understanding, Tseng obtained for Yowell two shipments of titanium dioxide. However, when Tseng failed to provide the titanium dioxide on terms Yowell thought were advantageous to him (Yowell wanted Tseng's supplier to release materials to him without payment and the supplier refused to do so), Yowell sued Tseng for breach of the Letter of Intent in the Chancery Court of Delaware. (D.I. 155, pp. 139–40.) In addition, Yowell claimed at trial that Tseng's breach of a noncompete clause in the Letter of Intent was one reason he refused to pay the aluminum invoices. (D.I. 156, p. 68.) Yowell also contended that the other reason he refused to pay the aluminum invoices was because China Resource breached a promise to provide CPM with a long term supply of titanium dioxide. (Id.) As stated above, China Resource did provide him with a long term supply which met his initial requirements.[21] From this evidence, a jury could reasonably infer that Yowell's intent in transferring the aluminum rods was to use the aluminum invoices as leverage to ensure a long term supply of titanium dioxide on his terms. If it was Yowell's intent to use the aluminum invoices as leverage, it was certainly his intent to at least delay, hinder or obstruct China Resource's attempts to collect on the aluminum invoice, if not to defraud China Resource completely.

#### b. Constructive Fraudulent Conveyance

▪ If there is no actual intent, a party may prove a fraudulent conveyance by proving that: (1) there was a conveyance; (2) the debtor was insolvent or was rendered insolvent by the conveyance; and (3) the conveyance was made without fair consideration. Del.Code Ann. tit. 6, § 1304; *West,* 299 F.Supp. at 664; *Tri–State Vehicle Leasing, Inc. v. Dutton,* 461 A.2d 1007, 1008 (Del. 1983). In addition to proving actual intent,

18. (CPM 4.) Zhao testified at trial that he was unwilling to transfer the aluminum rods to CPM because CPM was a new company and he did not trust a new company with both the aluminum and titanium inventories. Specifically, China Resource was willing to transfer the titanium dioxide but not the aluminum rods: (1) because the amount due on it was smaller than the amount due on the aluminum rods, and (2) because Yowell was specialized in titanium dioxide. (D.I. 155, pp. 89–90.)

19. In this letter, Yowell stated that "I will respond only on my TiO2 proposal, and you will respond on the Fayda aluminum proposal separately." (CPM 1.)

20. Tseng testified that:

A: Mr. Yowell came to me, I believe it was in April of 1990, and told me the only way he could pay for aluminum liability was that if I could help him to secure the titanium dioxide supply.

. . . . .

A: I told Mr. Yowell that he had to put some profit into an escrow account so he can assure me that he has full responsibility to pay off China Resource Products.

Q: Did he do that?

A: I tried many times. He just kept postponing it. He didn't do it.

(D.I. 155, p. 136.) In fact, Tseng drafted an "agreement on joint venture business" which specifically required CPM to set up an escrow account for the aluminum proceeds. (Tseng 4.) Tseng also agreed to a reduction in commission from 5% to 4% because "I was really anxious to get the aluminum problem taken care of." (D.I. 155, p. 138.) To Tseng, the obligation was a "moral thing." (Id., p. 124.) In addition, Yowell admitted at trial that the escrow account was a condition to their continuing relationship. (D.I. 156, p. 51.)

21. The understanding between China Resource and CPM was that China Resource was to "contract Chinese supply on behalf of CPM Industries for 1200/MT of Titanium Dioxide and try to get a price of USD 1,250 or better with payment L/C 45 days from date of shipment." (PX 51.) China Resource found such a supplier. (PX 52.) China Resource was not obligated to find the best price on the market.

China Resource also proved these elements of a constructive fraudulent conveyance.

### (1) Conveyance

A "conveyance" is defined as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." Del.Code Ann. tit. 6, § 1301(2). CPM argues that there was no "transfer" because both Tseng and Yowell had testified that there was no "transfer." (D.I. 155, pp. 109, 116; D.I. 156, p. 56.) Both had testified that there was no official or physical transfer. However, there was credible evidence that Yowell had gained control of Fayda's assets and placed those assets under CPM's name. *Supra* fn. 5. The fact that there was no "official" or "physical" transfer is irrelevant since the form of the transaction is not relevant. *China Resource Products (U.S.A.) Ltd. v. Fayda International, Inc.*, 788 F.Supp. 815, 820 (citing Peter A. Alces, *The Law of Fraudulent Transactions* ¶ 5.01[1], at p. 5–4 (1989)) ("[f]raudulent disposition principles may be implicated in any transaction that effectively transfers property interests."); *Black's Law Dictionary* 1342 (5th ed. 1979) ("[t]ransfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property. . . .").

### (2) Solvency of Fayda

A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

Del.Code Ann. tit. 6, § 1302.

CPM argues that Fayda was solvent at the time of the transfer. However, there is strong evidence to the contrary. First, the Letter of Intent which Yowell had drafted shows that Fayda's liabilities totaled $824,-000.00 while its assets only totaled $547,-000.00. (PX 22.) Fayda was insolvent before the transfer. CPM argues that the Letter of Intent values are book values and

not fair saleable values. In fact, it is unclear whether these values represent book values or market values. Yowell testified that the aluminum inventory figure was the market value while the titanium inventory figure was the book value. *See supra* text accompanying note 8.

On the other hand, it is clear that Fayda was rendered insolvent by the transfer of its assets. The credible evidence shows that after the transfer Fayda had no assets left.[22] In addition, CPM only assumed the liability for the titanium invoices and left the other liabilities, including the aluminum invoices which alone totaled $374,000.00. Without any assets, there was no way for Fayda to pay its liabilities.

### (3) Fair Consideration

Fair consideration is defined as:

(1) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or

(2) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Del.Code Ann. tit. 6, § 1303. Fair consideration means "a fair equivalent to the property given up." *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 792 (Del.Ch.1992). There is more than enough credible evidence to show that the transfer was without fair consideration. CPM received all of Fayda's assets, valued at $547,000.00, and both Tseng and Kidner testified that other than the $265,000.00 titanium invoice and 25% of Fayda's worthless stock, Fayda received nothing from the transfer. (D.I. 155, pp. 111, 114, 120, 145, 155.)

### 2. Improper Exclusion of Evidence— Testimony of Andrew Lubin Should Have Been Allowed

■ CPM argues that this Court should grant a new trial because it refused to allow

---

22. Tseng testified that Yowell took everything and left Fayda with almost $400,000.00 in liabili-

ty. (D.I. 155, pp. 114, 120, 145.) *See also supra* n. 7 & 14.

Andrew Lubin to testify as an expert.[23] CPM, however, failed to provide China Resource with an expert's report as required by Fed.R.Civ.P. 26(a)(2).[24] Federal Rule of Civil Procedure 37(c)(1) states that, "a party that . . . fails to disclose information required by Rule 26(a) . . . shall not . . . be permitted to use as evidence at a trial . . . any witness or information not so disclosed." Fed. R.Civ.P. 37(c)(1).

### 3. Improper Submission of an Issue— Defendants Tseng and Kidner Went Beyond the Scope of Pretrial Order

■ CPM also contends that Tseng and Kidner went beyond the scope of the pretrial order because "the whole thrust of the testimony and arguments of Ms. Tseng, Mr. Kidner and their attorney at trial was that Mr. Yowell and CPM had done wrong while they were only innocent by-standers." (D.I. 154, p. 20.) This Court finds that Tseng and Kidner's defense did not go beyond the scope of the pretrial order. Fact issue # 46 of the parties' pretrial order states: "whether Fayda's assets were 'transferred' to CPM or whether they were taken (converted) by CPM or its officers." (D.I. 119, p. 25.)

■ In addition, even if this Court assumes that Tseng and Kidner went beyond the scope of the pretrial order, "a trial court does not abuse its discretion in allowing evidence to be received on an issue not included in the pretrial order where the opposing party fails to object or to claim surprise to the introduction of evidence. . . ." *Emmons v. Southern Pacific Transp. Co.,* 701 F.2d

1112, 1118 (5th Cir.1983). *See Bucky v. Sebo,* 208 F.2d 304, 305 (2d Cir.1953); *Perfection–Cobey Co. v. City Tank Corp.,* 597 F.2d 419, 420–421 (4th Cir.1979); *Manbeck v. Ostrowski,* 384 F.2d 970, 975–76 (D.C.Cir.1967), *cert. denied,* 390 U.S. 966, 88 S.Ct. 1077, 19 L.Ed.2d 1170 (1968); 3 James M. Moore *et al., Moore's Federal Practice,* ¶ 16.19, at p. 16–92.

During the trial, CPM never objected to Tseng or Kidner's testimony. In addition, it can hardly be argued that CPM was surprised by the general nature of Tseng and Kidner's defenses. During her December 1992 deposition, Tseng stated that "[h]e (meaning Mr. Yowell) is such a greedy person. He took everything out of Fayda International. He left Fayda International with all the liability. Sure, he returned. Sure, he returned his 25 percent, so he did not have to take any responsibility. That's how I see it." (D.I. 155, p. 114.)

### C. This Court Should Proceed With The Counterclaims Of CPM

■ Finally, CPM argues that this Court should proceed with the counterclaims of CPM against China Resource because:

[A]lthough they are couched in terms of being contingent on a finding by the Court that CPM is liable on the contract for the purchase of the aluminum, essentially that is the verdict that the jury returned. . . . The jury's verdict did not make sense in the context of a UFTA case. . . .

---

**23.** CPM also argues that Yowell should have been able to testify as to the net proceeds of the aluminum sales. However, it is the value at the time and place of transfer that was at issue. *McCaulley,* 22 A.2d at 864. In *McCaulley,* the court used the proceeds of the sale only because the value at the time and place of transfer was not available. *Id.* In this case, the plaintiff produced several numbers as the value of the aluminum rods at the time and place of transfer. The proceeds, net or gross, from sales spanning ten months from the date of transfer are not relevant in this case.

**24.** Fed.R.Civ.P. 26(a)(2) provides in relevant part that:

[D]isclosure shall . . . be accompanied by a written report prepared and signed by the witness. The report shall contain a complete

statement of all opinions to be expressed and the basis and reasons therefor. . . .

Fed.R.Civ.P. 26(a)(2)(B). This amended rule became effective on December 1, 1993. The Supreme Court provided that these new amendments would govern all proceedings then pending "insofar as just and practicable." Courts have held that "to the maximum extent possible, the amended Rules should be given retroactive application. . . ." *Salkey v. Garrett,* 1993 WL 547461, at *5 (E.D.N.Y. December 23, 1993) (citing *Skoczylas v. Federal Bureau of Prisons,* 961 F.2d 543, 546 (5th Cir.1992)). In this case, the amended rules became effective on December 1, 1993 and the trial began on April 18, 1994. CPM had more than four months to comply with the new requirement.

(D.I. 159, p. 5.) As noted above, this Court finds that the jury's verdict does make sense in the context of the fraudulent conveyance case. In addition, even if it did not, this Court cannot assume that the jury returned a verdict on a theory that was never presented to them. The claim of breach of contract against CPM was not tried; only the plaintiff's fraudulent conveyance and civil conspiracy claims were tried and CPM's counterclaims are not relevant to the plaintiff's claims that were tried. This Court cannot allow the counterclaims alone to proceed without infringing on the plaintiff's due process rights.[25]

## V. CONCLUSION

All the parties were given the opportunity to persuade the jury of their version of what had transpired among them in this case. It was the jury's prerogative as to which witnesses they found credible, and ultimately, which version they found most convincing and credible. Obviously, the jury determined that the witnesses and facts presented by the plaintiff and defendants Tseng and Kidner were more believable than CPM's witnesses and facts. Since this Court finds that there is legally sufficient evidence to support this determination, this Court cannot disturb the jury's verdict and denies defendant CPM's motion for judgment as a matter of law. In addition, this Court finds no grounds for granting a new trial.

A judgment will be entered forthwith in accordance with this opinion.

---

**25.** Defendant CPM has also made a motion to stay the execution of the judgment pursuant to Fed.R.Civ.P. Rule 62(b). Rule 62(b) concerns a stay on motion for new trial or for judgment. With this opinion, this motion is now moot. In any event, this Court can find no reason to stay the execution of this judgment.